Zoltan SOMOGYI, Plaintiff,

v.

Edward J. BUTLER, Jr., Charles Oldakowski, George Butler, Robert Butler, and Gordon Butler, individually and as Trustees under Deed of Trust made and executed by Edward J. Butler, Jr., dated July 1, 1971, World-Wide Volkswagen Corp., Michael Sweeney, John Doe and Richard Roe, Inc., Defendants.

Civ. A. No. 80–271.

United States District Court,
D. New Jersey.

July 10, 1981.

Robert H. Jaffe, Jaffe & Schlesinger, P. A., Springfield, N. J., for plaintiff.

Dale A. Schreiber, Schreiber, Klink, Schreiber, Lehnardt & Carney, P. C., New York City, Richard A. Levin, Amster & Levin, P. A., Millburn, N. J., for defendants Edward J. Butler, Jr., Charles Ołdakowski, George Butler, Robert Butler and Gordon Butler.

## OPINION

DEBEVOISE, District Judge.

Plaintiff, Zoltan Somogyi, brings this action charging federal securities laws viola-

tions and common law fraud in connection with his purchase in 1976 of the assets and good will of a Buffalo, New York Volkswagen dealership, lease of the dealership premises and acquisition from the regional Volkswagen distributor of a Volkswagen dealership franchise.

Named as defendants in the action are: Edward J. Butler, Jr., seller of the assets and good will of the dealership and co-trustee of a trust (the "Butler Trust") which owned and leased the dealership premises; George Butler, Gordon Butler, Robert Butler and Charles Oldakowski, remaining trustees of the Butler Trust; World-Wide Volkswagen Corp., the regional distributor; and Michael Sweeney, a former World-Wide Volkswagen employee. Jurisdiction is founded upon Section 22 of the Securities Act of 1933 (1933 Act), 15 U.S.C. § 77v and Section 27 of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78aa. Jurisdiction over the state law claims is founded upon the court's pendent jurisdiction or, in the alternative, diversity of citizenship of the parties, 28 U.S.C. § 1332(a).

Defendants Edward J. Butler, George Butler, Gordon Butler, Robert Butler and Charles Oldakowski[1] (the "Butler trustees") assert counterclaims against plaintiff: (1) to recover on state court judgments for payments due under the dealership lease agreement; (2) for damages resulting from plaintiff's alleged default on the lease; (3) for additional sums owing under the lease agreement; (4) for attorneys' fees and costs in connection with the counterclaims; and (5) for sanctions against plaintiff for commencing the action in bad faith. Jurisdiction over the counterclaims is founded upon diversity of citizenship and the court's ancillary jurisdiction.

The matter is now before the court on motions by the Butler trustees: (1) to dismiss the federal securities laws counts for failure to state a claim upon which relief may be granted; (2) to dismiss the federal securities laws counts as barred by the relevant statutes of limitation; and (3) for summary judgment, under principles of *res judicata* and collateral estoppel, on all counts of the complaint and on their first counterclaim. Because matters outside the pleadings have been presented to and not excluded by the court, all motions will be treated as motions for summary judgment, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, and will be disposed of as provided in Rule 56. All parties have had a reasonable opportunity to present materials pertinent to the summary judgment motions. *See Switlik v. Hardwicke Company, Inc.*, 651 F.2d 852 (3d Cir. 1981).

## I.

In order to prevail on a motion for summary judgment, the moving party must make an affirmative showing based upon the pleadings, depositions, answers to interrogatories, admissions on file, affidavits and uncontested exhibits that "there is no genuine issue of material fact and that he is entitled to judgment as a matter of law." Rule 56, Federal Rules of Civil Procedure. The opposing party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." *DeLong Corporation v. Raymond International, Inc.*, 622 F.2d 1135 (3d Cir. 1980). Once the party opposing the motion has met this burden, all reasonable inferences of fact must be drawn in his favor. *Adickes v. Kress & Co.*, 398 U.S. 144, 147, 90 S.Ct. 1598, 1602, 26 L.Ed.2d 142 (1970); *Small v. Seldow's Stationery*, 617 F.2d 992, 994 (3d Cir. 1980).

1. Defendant Charles Oldakowski was served on February 22, 1980 and filed a separate answer on April 14, 1980. The remaining Butler trustees were served by substituted service in October and November, 1980 and filed a more comprehensive answer containing counterclaims. Defendant Oldakowski has moved for leave to amend his answer to conform to that filed by his codefendants and to assert the same counterclaims. Since such an amendment will be in the interests of justice and will not prejudice plaintiff, leave will be granted pursuant to Rules 13(f) and 15(a) of the Federal Rules of Civil Procedure. *See Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

The parties have submitted extensive factual materials in connection with the motion, in the form of affidavits and exhibits. Each of the Butler trustees has submitted an affidavit, as has plaintiff Somogyi. In addition, a number of documents relating to the parties' business transactions and to the state court proceedings have been supplied. An account of the facts revealed by these evidentiary sources follows; with noted exceptions, the facts are not in dispute.

## A.

The focus of the controversy is an automobile dealership located in Buffalo, New York. Defendant Edward J. Butler purchased the dealership in 1968 from Chrysler Motors Corporation and began doing business on the premises as a retail seller of Volkswagens under the name, Butler Volkswagen, Inc. Butler was the sole shareholder, director and officer of the corporation.

In 1971, Butler executed a trust agreement and deed conveying the dealership premises, but not the business itself, in trust for the benefit of his children. The premises were then leased by the trust to Butler Volkswagen, Inc., which continued to operate a Volkswagen dealership at the site under Butler's sole ownership. Butler originally named himself and a single co-trustee as trustees of the Butler Trust. In early 1976, the co-trustee resigned and Butler named as successors three of his brothers, George Butler, Gordon Butler and Robert Butler, and a personal friend, Charles Oldakowski. These four individuals have been named as defendants in the action in their capacity as trustees of the Butler Trust.

In early 1975, Butler alleges, he became interested in selling his Volkswagen dealership business. For assistance in locating a suitable buyer, he called upon World-Wide Volkswagen Corporation, the regional Volkswagen distributor and dealership franchisor. Late in 1975 or early in 1976 defendant Michael Sweeney, then a field representative for World-Wide Volkswagen, telephoned Butler to inform him that prospective purchasers had been located: Mik-los Mohacsi, an Illinois resident who had previously been employed by Fiat Motors and other automotive companies, and Zoltan Somogyi, a New Jersey businessman. Shortly afterward negotiations commenced between Butler, Mohacsi, Somogyi and World-Wide Volkswagen which culminated in Mohacsi's and Somogyi's agreement, in April, 1976, to purchase the business.

It is plaintiff Somogyi's contention that, during the course of the negotiations, misrepresentations were made and material facts omitted which induced him to purchase the business and ultimately to incur substantial business losses. Butler, however, claims that Somogyi was a hard bargainer and, with full knowledge of all relevant details, purchased the business on highly favorable terms. The events which took place during the negotiations are a subject of considerable dispute.

Butler alleges that he explained to Somogyi and Mohacsi, during an initial meeting on the dealership premises in Buffalo in late 1975 or early 1976, that Butler Volkswagen had done poorly as a business in the past. He claims to have told them, however, that the dealership had the potential to be more lucrative; that its poor performance could not be attributed to a poor Volkswagen product line or to any weakness in the Buffalo economy, but primarily to the fact that he had run the business as an absentee owner and had not exercised adequate supervision over his management; and that, specifically, both his general manager, who had day-to-day responsibility for all dealership operations, and his service manager were inadequate and should not be retained by Mohacsi and Somogyi if they purchased the business.

Butler further alleges that, during the negotiations leading up to the signing of a purchase agreement, he had no substantive discussions with Somogyi, Mohacsi or anyone else on their behalf regarding the dealership's earning history, nor did he furnish anyone with Butler Volkswagen's past financial statements. He states that he did, however, authorize World-Wide Volkswagen to permit Somogyi and Mohacsi to

inspect the dealership's financial and business records on file with the distributor. Somogyi must have availed himself of the opportunity to inspect these records, Butler contends, because he subsequently produced, in response to a document request by defendant Oldakowski, copies of Butler Volkswagen's financial statements for the years, 1974 and 1975. These statements, Butler points out, show net losses for the years, 1974 and 1975, of $40,000.28 and $21,-608.31 after deductions for his salaries of $17,600 and $14,400. (See Defendants' Exhibit B).[2]

In addition to reviewing financial data, Butler alleges, Somogyi and Mohacsi personally inspected the day-to-day operations of Butler Volkswagen, Inc. Shortly after the initial meeting in Buffalo, he states, Mohacsi paid a visit to the dealership and spent several days observing its operations and taking inventory of its parts, accessories and equipment.

World-Wide Volkswagen, represented by defendant Sweeney, played an active role in the negotiations from beginning to end, apparently exercising considerable control over the terms of the final agreement in its capacity as the exclusive area dealership franchisor. Butler contends that World-Wide Volkswagen, as an automobile distributor, was more interested in the economic well-being of a future dealer than of an outgoing dealer, and that it exercised its control to obtain the best possible deal and lowest possible price for Somogyi. In his affidavit, Butler recites a number of concessions as to price and other terms of purchase allegedly imposed upon him by World-Wide Volkswagen. He claims, for example, that contrary to his original

wishes, he was persuaded to grant Somogyi and Mohacsi not only a lease but also an option to purchase the dealership premises and to substantially lower his asking price for the dealership assets.

Somogyi, on the other hand, tells a very different tale. He claims that when he was first contacted by Sweeney about the possibility of purchasing Butler Volkswagen, Inc., he was "very hesitant" to undertake such a venture, particularly since the business was far from his home and he would be an absentee owner. He contends, however, that Butler and Sweeney, by supplying him with false and misleading financial data, ultimately convinced him that the Buffalo dealership could be "very profitable" and that he should make the purchase despite his initial reservations.

Somogyi denies that Butler ever revealed that his business had performed poorly in the past. "To the contrary," Somogyi avers, "his representations were always that BVW [Butler Volkswagen, Inc.] was a successful dealership, had a long history of being profitable, had an excellent reputation in the Buffalo area and a fine staff of employees, all of whom he recommended we retain." (Affidavit of Zoltan Somogyi, ¶ 10). As for Butler Volkswagen's past financial statements, Somogyi acknowledges having received the 1975 financial statement but denies ever having seen the 1974 statement. Somogyi alleges that both Butler and Sweeney explained to him that the 1975 statement showed a slight loss only because of "the salaries taken by Mr. Butler during 1975," without which the business would have made a net profit.[3] Throughout the negotiations, Somogyi alleges, Butler and Sweeney represented to him that

---

2. Butler further alleges that he referred Somogyi to Daniel O'Connell of the accounting firm of Daniel & O'Connell in Buffalo, who had been Butler Volkswagen's accountant since its inception, for information regarding the dealership's financial history. Somogyi responds, however, that he first met O'Connell only after he closed on the business in April, 1976 and that he never received any financial statements from him.

3. This statement in Somogyi's affidavit is not consistent with his complaint. In his complaint, he alleges that defendants misrepresented to him "[t]hat Butler Volkswagen, Inc. operations resulted in a profit during the three years ending December 31, 1973, 1974 and 1975 after deduction for a substantial salary and bonus paid to defendant Edward J. Butler, Jr. as the dealer." (Complaint, ¶ 5(b)). Furthermore, it is obvious that disregarding Butler's salary of $14,400 in 1975 would not convert a $21,608.31 net loss into a net profit.

Butler Volkswagen, Inc. had been very successful in prior years, especially the years 1971 through 1974.

Somogyi takes issue with Butler's account of the role of defendants Sweeney and World-Wide Volkswagen in the negotiating process. He alleges in his complaint that Butler had made a prior agreement to employ Sweeney in his organization of automobile dealerships "if he could fraudulently induce Somogyi to invest in Somogyi Volkswagen, Inc.," and that Sweeney only appeared to be acting on World-Wide Volkswagen's behalf. In his complaint, however, Somogyi stated that the details of the agreement were "yet unknown" to him, and he has not supported his allegation by affidavit. (Complaint, ¶ 7(e)).

Somogyi claims that the key factor which induced him to purchase Butler's business was a false and misleading *pro forma* balance sheet and income statement prepared by defendant Sweeney "ostensibly" on behalf of World-Wide Volkswagen, and purportedly based upon Butler Volkswagen's previous operational history and financial performance.[4] Somogyi contends that "[b]oth defendant Sweeney and defendant Butler repeatedly made reference to the pro forma balance sheet, emphasized the profitability of the dealership and convinced me that BVW was profitable and that SVW [Somogyi Volkswagen, Inc.] would likewise be a successful business." (Affidavit of Zoltan Somogyi, ¶ 7). Specifically, Somogyi alleges, "Butler reviewed the balance sheet with me and informed me that the projections prepared by Sweeney in said statement were accurate and that BVW had always been profitable prior to 1975." [5]

Finally, Somogyi disputes Butler's overall contention that Somogyi and Mohacsi, through hard bargaining and the assistance of World-Wide Volkswagen, ultimately succeeded in purchasing his Buffalo dealership for a highly favorable price. "An overall reading of the circumstances set forth in the Butler affidavit," Somogyi states, "would lead one to believe that I obtained a bargain price for the BVW dealership because BVW was doing so poorly at the time of the sale. This is simply untrue. The price which we negotiated was based on the fact that the equipment and facilities of the dealership were in a state of disrepair. The dealership itself, its reputation and its prior history, were the only reasons that we agreed to pay over $175,000 to the Butler group for this business." (Affidavit of Zoltan Somogyi, ¶ 11).

Between mid-February and mid-June, 1976, the parties and their counsel negotiated and drafted the basic agreements for the purchase of the dealership, rental of the

4. Somogyi has appended to his complaint a *pro forma* balance sheet (Exhibit A) and income statement (Exhibit B).

  The balance sheet, dated November 6, 1975, makes no reference to projected earnings or profitability. It merely lists projected assets and liabilities and sets out minimum capital requirements for the business. Specifically, the *pro forma* balance sheet calls for an initial owner's equity of $148,000 and an additional long term loan of $148,000, for a total of $296,000 in working capital. The balance sheet specifies that profits from the business must be retained until the long-term loan is repaid.

  The *pro forma* income statement, which bears no date, projects a before-tax net income of $138,500 on the basis of a capital investment of $248,000 and a volume of automobile sales, together with associated expenses, set out in attached schedules. While plaintiff misleadingly implies in his complaint (¶ 7(b)) and his affidavits that the *pro forma* income statement induced him to sign the purchase agreement in April, 1976, he himself admits that the income statement was not prepared until June, 1976, well after the purchase agreement was signed. (Complaint, ¶ 7(g)).

5. The allegations made here must be viewed in light of a letter submitted by Butler as an exhibit to his moving papers (Exhibit L). The letter, on Somogyi Volkswagen, Inc. stationery, is written by Miklos Mohacsi, addressed to Edward J. Butler, Jr., and dated March 3, 1977. It begins:

  "As you will recall, during the purchase negotion [sic] of your Dealership and the Lease negotion, a $4,500.00 monthly rent was agreed upon by all parties. You and we had realized the economic condition of the Buffalo Area and Volkswagens Market performance at that time. We also agreed that the first two years would be hard and difficult times, therefore, you accepted our proposal to reduce the monthly rent for the first two years of the lease agreement from $4,500 to $3,500 per month."

premises and acquisition of a dealership franchise. A final purchase and sale agreement was signed on April 24, 1976. (See Defendants' Exhibit E). A lease (Defendants' Exhibit G), lease guarantee (Defendants' Exhibit J) and option agreement for the purchase of the dealership premises (Defendants' Exhibit I) were signed at the closing on June 16, 1976. The terms of the overall set of agreements are relevant to plaintiff's claims under the federal securities laws and will be considered in some detail.

In the April 24, 1976 purchase and sale agreement, Somogyi and Mohacsi agreed to purchase from Butler Volkswagen, Inc. its entire new vehicle inventory, machinery and equipment, motor vehicle parts and accessories, furniture and fixtures, and good will. In addition, it was agreed that Somogyi and Mohacsi could purchase at their option the dealership's used car inventory, company vehicles, work in process and prepaid insurance. The price agreed to for the machinery, equipment, furniture and fixtures was $65,000 [6] and for the dealership's good will, an additional $10,000. The remaining items to be purchased were, for the most part, valued at either the seller's cost or book value. The aggregate purchase price was to be determined "as soon as practicable" after the execution of the agreement, and a closing was set for May 1, 1976 or when all action required prior to closing had been completed.

The parties also agreed in the April 24, 1976 agreement to a twenty-year lease of the dealership premises. The seller agreed "to cause the Edward J. Butler Jr. Trust to enter into a 20 year net lease . . . with either the Buyers or a corporation to which [sic] Buyers shall form . . ." and also to cause the Trust to offer an option to purchase the premises. The buyers agreed to enter into the lease and further agreed that, if they elected to do so as a corpora-

tion, they would personally guarantee the lease "to a limited extent". (¶¶ 6(b) and 7(a)).

As for the dealership franchise, the parties agreed that Butler Volkswagen, Inc. would terminate its dealer franchise agreement with World-Wide Volkswagen Corporation and use its "best efforts to obtain the consent of World-Wide Volkswagen" to the purchase and sale agreement and to the execution of a dealer franchise agreement with Somogyi and Mohacsi in "its customary form." The consent of World-Wide Volkswagen was made an express condition of the agreement at the option of either buyer or seller. Specifically, the parties agreed in Paragraph 8(c) of the contract that, as a condition of their obligations to each other:

> World-Wide Volkswagen Corporation shall have consented to the sale of the Purchased Assets to the Buyers and World-Wide Volkswagen Corporation shall have delivered a letter of intent to issue a Franchise Agreement to Buyer with the only condition to such issuance being (i) successful negotiation of this Agreement; (ii) acquisition of an approved lease; (iii) minutes of the new Corporation authorizing the acquisition; (iv) That finance requirements set forth in World-Wide Volkswagen Pro-Forma dated November 6, 1975 will be met.

At the time the agreement was signed on April 24, 1976, Somogyi and Mohacsi had apparently not been able to obtain a commitment for the $148,000 loan of working capital called for in World-Wide Volkswagen's *pro forma* balance sheet. The parties therefore executed an addendum to the agreement which provided that:

> The parties to this addendum have executed the above referred to agreement on the express condition that Buyers individually or collectively are able to obtain a capital loan in the amount of $148,000.

---

**6.** The price for the machinery, equipment, furniture and fixtures was evidently the subject of extended negotiation between the parties. In an initial draft of the purchase agreement, prepared in February, 1976, the figure specified was $75,000. In the initial draft of the April 24,

1976 agreement, the figure listed was $90,000. Butler alleges that a reduction from $90,000 to $65,000 was a last-minute concession to the buyers and was included by the parties in an amendment to the purchase agreement. (See Defendants' Exhibit E–1).

The Buyers ... individually agree to use their best efforts to obtain a capital loan in the amount of $148,000. The Buyers ... individually agree to use their best efforts to obtain such capital loan at the earliest possible time. In the event that a capital loan is unobtainable, the contract shall become null and void. (Defendants' Exhibit E–2).

The parties also provided in the addendum that a down payment toward the final purchase price, in the amount of $20,000, would be made when the capital loan was obtained.

Somogyi alleges that at the time the purchase and sale agreement was executed, it was the parties' understanding that the buyers would form a corporation, to be known as Somogyi Volkswagen, Inc., and that the corporation would issue capital stock of $148,000, the owners' equity figure specified in World-Wide Volkswagen's *pro forma* balance sheet. Somogyi was to be responsible for raising $140,000 of the owners' equity and Mohacsi, who was to be the manager of Somogyi Volkswagen, Inc., was to supply an additional $8,000. The owner's equity was to be combined with the capital loan of $148,000, referred to in the addendum to the agreement, to form the minimum working capital of $296,000 required by World-Wide Volkswagen. Somogyi contends that the language of Paragraph 8(c) of the purchase agreement, together with that of the World-Wide Volkswagen *pro forma* balance sheet, "clearly reflects the fact that the Volkswagen dealership which I was purchasing from defendants Butler was to be organized as a corporation with not less than $148,000 in capital stock issued." (Supplemental Affidavit of Zoltan Somogyi, ¶ 2).[7]

7. While the language used by the parties clearly indicates that they expected the buyers to form a corporation, nothing in any of the documentary materials provided suggests that such a form of business organization was required. As long as World-Wide Volkswagen's minimum capital requirements were met, it would seem a matter of indifference to both the seller and the distributor whether the buyers chose to organize as a sole proprietorship, a partnership or a corporation.

Soon after executing the April 24, 1976 purchase agreement, Somogyi alleges, he telephoned Sweeney and Butler to inform them that he did not have the funds available to put up his $140,000 share of the owners' equity. The reason for the cash shortage, he claims, was that a planned sale of real property which he was developing in New Jersey had been delayed by litigation. Sweeney and Butler, he states, then undertook to assist him in raising the cash necessary to supply his portion of the owners' equity, thus making it possible for the sale to take place.

According to Somogyi, Sweeney paid a visit to his Edison, New Jersey construction company office some time after his phone call, and explained to him that Butler had arranged with the Liberty National Bank in Buffalo to obtain for him a personal loan of $100,000. The loan was to be unsecured, but personally guaranteed by Butler. But for Butler's personal guarantee, Somogyi contends, he could not have obtained the loan and could not have carried through with his purchase of the dealership business.

Somogyi had an equal amount of difficulty in obtaining the $148,000 capital loan required by World-Wide Volkswagen as a condition of receiving the franchise. He alleges that he approached the Liberty National Bank in Buffalo about a loan but was turned down.[8] He then sought a loan from the First National Bank of Edison, New Jersey but did not meet with success. Finally, he claims, in May, 1976, Sweeney succeeded in arranging a loan from Marine Midland Bank-Western, of Buffalo, New York in the amount of $100,000. Since this

8. Somogyi alleges in his complaint that he was told by Sweeney that Liberty National Bank turned down his loan because all his assets were located in New Jersey. He claims, however, in both his complaint and affidavit, that this was a lie and that the bank's true reason was the poor prior business history of Butler Volkswagen, Inc. Butler states that he had no dealings with any bank on Somogyi's behalf and has no knowledge of the reasons why Somogyi was turned down by the Liberty National Bank.

amount was less than the $148,000 loan required by the *pro forma* balance sheet, Somogyi contends, Sweeney then convinced World-Wide Volkswagen to accept total capital financing for the dealership of only $248,000 instead of $296,000. Somogyi also claims that Sweeney reassured him that Volkswagen sales were increasing so quickly in the Buffalo area that the $100,000 loan would be sufficient for his purposes, and that he prepared in June, 1976, shortly before the closing, a "revised" *pro forma* income statement projecting an annual volume of sales sufficient to produce a pre-tax profit of $138,500 upon an investment of only $248,000.

At the closing on June 16, 1976, the parties executed a lease, a lease guarantee and an option to purchase the premises. The lease, which ran for a term of 20 years, called for rental payments in the third through twentieth years of $54,000 per year, or $4,500 per month. For the first two years of the lease, the rent was reduced to $42,000 per year, or $3,500 per month. The parties provided, however, that for the first two years the tenants would pay as additional rent 2% of all sales over $700,000 per six-month period, not to exceed a total of $6,000 in any one lease year. (Defendants' Exhibit G). In addition, Somogyi and Mohacsi undertook to personally guarantee the terms of the lease for the first ten years only of its twenty year term. By the terms of the guarantee, the obligations of each tenant expired immediately upon his death and did not run to his "estate, heirs or beneficiaries at law." (Defendants' Exhibit J). Butler alleges that, since he did not find the terms of the lease guarantee satisfactory, he obtained an additional commitment from Somogyi that he would not "set up any trust or transfer any property owned by me individually or jointly by me and my wife so as to diminish my net worth to an amount less than $500,000" during the term of the lease. This commitment was formalized in a letter dated June 16, 1976 and signed at the closing. (Defendants' Exhibit H). Finally, plaintiff received at the closing an option to purchase the dealership premises at fair market value, the value at the time of exercise to be determined by three independent appraisers. (Defendants' Exhibit I).

At the closing, Somogyi and Mohacsi paid to Butler most of the balance of the purchase price. Butler, however, accepted $10,000 of the purchase price in the form of a promissory note, bearing no interest, payable in equal weekly installments of $200 for fifty weeks, and personally guaranteed by Somogyi and Mohacsi. The note provided that payments were to commence when Butler Volkswagen, Inc. provided satisfactory evidence that a lien on the shop's hoists had been satisfied or discharged.

### B.

Almost immediately after Somogyi and Mohacsi closed on the Buffalo dealership and began to operate their own retail Volkswagen sales business on the premises, they began to lose money. Somogyi alleges in his complaint that during the first six months of operations in 1976, Somogyi Volkswagen, Inc. lost $35,000. During the first full year of operations, 1977, the business lost $137,607. After he reviewed Somogyi Volkswagen's financial statements for 1977 in early March, 1978, Somogyi claims, he "realized he had been defrauded by defendants." After giving notice to Butler, the Butler Trust and World-Wide Volkswagen, he alleges, he terminated all operations of Somogyi Volkswagen, Inc. on March 15, 1978.

Among the misrepresentations Somogyi alleges to have been made as part of defendants' fraud were: "that Butler Volkswagen, Inc. had established a good reputation in the Buffalo area for sales and services [sic] of Volkswagen vehicles which would constitute an asset if acquired by Somogyi Volkswagen, Inc."; "that Butler Volkswagen, Inc. had a core of experienced employees in its sales and service departments and sufficient equipment and tools which could be taken over by Somogyi Volkswagen, Inc. and thereby result in substantial savings in start-up costs"; "that Somogyi Volkswagen would receive at least

184 diesel 'Rabbit' vehicles from defendant World-Wide for sale during the period January 1, 1977 through December 31, 1978"; and "that Somogyi Volkswagen, Inc. [would] earn a profit before bonuses and taxes for its first full year of operation, commencing January 1, 1977 and ending December 31, 1977, totalling $138,500." (Complaint, ¶ 5).

Among the material facts Somogyi claims to have been omitted by defendants as part of their fraud were: that "previous customers of Butler Volkswagen, Inc. had been charged for work by its Service Department which had not [been] done and when done they had been overcharged for labor and parts"; that "the cash and capital requirements projected by defendant World-Wide was [sic] inadequate for Somogyi Volkswagen, Inc. in the light of the poor reputation of Butler Volkswagen, Inc."; and that "competing Volkswagen dealers in the Buffalo area had established dominant positions over Butler Volkswagen, Inc. which could only be overcome by a costly advertising campaign."

Butler denies the perpetration of any fraud. Rather, he claims, it was Somogyi's lack of experience or competence in the business of retailing automobiles which resulted in the poor performance of Somogyi Volkswagen, Inc. Butler alleges that he became aware that Somogyi had serious problems managing the business when he received a letter from Joseph R. Pugia, Sr., Miklos Mohacsi's successor as manager of Somogyi Volkswagen, Inc., dated January 31, 1978. In the letter, Pugia reported that a certified audit of the year's performance was just being completed and that the anticipated losses would be considerable. Pugia stated that he thought the dealership had the potential to recoup all its losses and even to make a substantial profit, but that Somogyi had no knowledge of the business and kept faulty books. (Defendants' Exhibit M).

Soon after the closing on June 16, 1976, Butler alleges, Somogyi began withholding various sums of rent on the ground of alleged defects on the premises. After Somogyi terminated his business operations in March, 1978, Somogyi Volkswagen, Inc. ceased paying rent to the Butler Trust altogether. Butler alleges that he then attempted to negotiate a settlement with Somogyi of his obligations under the lease guarantee contract, but was unsuccessful. In the summer of 1978, the Butler Trustees commenced legal proceedings against Somogyi Volkswagen, Inc., Somogyi and Mohacsi to recover sums owing under the lease and lease guarantee contracts.[9]

## C.

The Butler Trustees pursued legal proceedings in the courts of both New York and New Jersey. The facts pertinent to the proceedings have been set forth in the affidavits of the Butler Trustees' New York counsel, Victor C. Silverstein, and New Jersey counsel, Paul W. Rosenberg, and have not been contested by plaintiff.

The Butler Trustees commenced an action on September 13, 1978 in the Supreme Court of New York, Erie County against Somogyi Volkswagen, Inc., Somogyi and Mohacsi asserting three causes of action. (Defendants' Exhibit N). In the first count, the trustees sought recovery against Somogyi Volkswagen, Inc. for non-payment of rent and taxes due through July, 1978 on the Buffalo dealership premises in the total amount of $51,757.33. In the second count, also against Somogyi Volkswagen, Inc., the trustees sought attorneys' fees and costs in the amount of $12,939.33. In the third count, the trustees sought recovery of the total amount sought in counts one and two, $64,696.66, from Somogyi and Mohacsi under their agreement to personally guarantee the lease.

**9.** On June 11, 1979, Butler states, the Butler Trustees sold the trust's real property in Buffalo, New York for non-dealership use. The price, he alleges, "was substantially less than the price that would have been obtained had

Mr. Somogyi continued to use the Dealership Facility for a retail automotive operation, in accordance with the terms of our lease." Butler has not, however, specified the price at which the dealership property was sold.

Somogyi filed a separate answer on November 2, 1978 denying the material allegations of the complaint and asserting three affirmative defenses: (1) that the guarantee was void for lack of consideration; (2) that the Butler Trustees had failed to relet the premises and thereby mitigate damages; and (3) that the Butler Trustees had wrongfully dispossessed the tenants from the leased premises on August 16, 1978 without first providing three days notice as required in the lease. Somogyi did not assert as defenses either common law fraud or violation of state or federal securities laws.

On December 11, 1978, the Butler Trustees served a notice for discovery and inspection, requesting the production of records and documents in Somogyi's custody and control. Upon Somogyi's failure to comply, the Butler Trustees moved in Special Term for an order compelling compliance. The motion was granted, and an order was entered by Justice Stiller on January 25, 1979 directing Somogyi to produce the requested documents.

Despite the order, Somogyi failed to comply with the discovery request and on November 6, 1979 the Butler Trustees moved for an order directing that the issues be deemed resolved in their favor and that judgment be entered against Somogyi. On April 30, 1979, after appearances by counsel and oral argument, Justice Mintz of the Supreme Court of New York entered an order pursuant to New York Civil Practice Law and Rules (CPLR) 3126 granting partial summary judgment against Somogyi in the amount of $27,714.81, representing part of the rent and taxes alleged to be due, together with costs and interest, for his failure to comply with the discovery order. The remainder of the action was severed for further proceedings. On May 22, 1979, judgment was entered in the Erie County Clerk's Office, pursuant to the order, for the sum of $31,200.97. Somogyi did not appeal the judgment.

On February 7, 1980, after commencing the present action, Somogyi moved before Justice Mintz for an order pursuant to New York CPLR 5015 vacating the prior order of April 30, 1979. Section 5015 provides that a court which has rendered a judgment may "relieve a party from it upon such terms as may be just ... upon the grounds of ... fraud, misrepresentation, or other misconduct of an adverse party..." As grounds for his motion, Somogyi alleged that he was pursuing an action against the Butler Trustees in the federal district court of New Jersey for fraud and securities law violations.

On August 18, 1980, the Butler Trustees cross-moved for an order granting them (1) additional partial summary judgment in the amount of $12,042.52, with interest, representing further rent due under the original complaint; and (2) granting them leave to serve a supplemental complaint alleging additional rent and taxes due under the lease and guarantee agreements arising after the date of the original complaint.

In a memorandum decision dated September 19, 1980, Justice Mintz denied Somogyi's motion to vacate the order of April 30, 1979. Somogyi's reliance on New York CPLR 5015, the Court held, was misplaced because "the fraud which that section addresses itself to is fraud practiced upon a party which results in the relief sought being granted not general fraud underlying the transaction between the parties." (Defendants' Exhibit X). The Court further noted that Somogyi could have filed an amended answer asserting a defense of fraud, but failed to do so prior to issuance of the order granting partial summary judgment against him. In the same decision, Justice Mintz granted the Butler Trustees' motion for additional partial summary judgment in the amount of $15,518.52 for rent and taxes due under the original complaint, and granted leave to file a supplemental complaint. The Court provided, however, that enforcement of the May 22, 1979 judgment in the amount of $31,200.97 and also the judgment to be entered could be stayed pending the outcome of Somogyi's federal court action on condition that he post a bond or other security in an amount sufficient to secure the judgments.

On November 7, 1980, judgment in the amount of $17,700.27 was entered against Somogyi pursuant to the Court's memorandum decision of September 19, 1980 and ensuing order of October 30, 1980. Neither of the judgments obtained by the Butler Trustees have been appealed in the courts of New York.[10]

The Butler Trustees, after obtaining the original judgment against Somogyi in New York in the amount of $31,200.97 on May 22, 1979, brought an action in the Superior Court of New Jersey, Law Division, on June 22, 1979 to enforce the judgment. (Defendants' Exhibit R). Somogyi filed an answer in which he denied that the judgment against him had been obtained on the merits and in which he asserted three affirmative defenses: (1) that the complaint failed to state a cause of action; (2) that the "allegations made by the plaintiffs arise out of transactions which were fraudulent in nature" and "[a]ccordingly . . . if a judgment was obtained . . . it was one that was obtained through fraud and is therefore not enforceable in a New Jersey Court"; and (3) that "the claims made by the plaintiffs . . . arise out of transactions in connection with the purchase of securities by defendant Somogyi and Somogyi Volkswagen Inc. and therefore are more properly a subject of a [sic] action in Federal District Court to be filed by defendant Somogyi". As a "counterclaim", Somogyi sought a stay of the action "pending the resolution of the claims of fraud against plaintiffs and other persons associated with them to be filed in Federal District Court". (Defendants' Exhibit S).

The Butler Trustees moved for summary judgment in the Superior Court on November 2, 1979. The Court denied the motion without prejudice on November 14, 1979 and permitted Somogyi to file an action in federal district court alleging fraud and federal securities laws violations. On January 25, 1980, six days before the filing of the present complaint, the Butler Trustees renewed their motion for summary judgment. According to the Butler Trustees' New Jersey counsel, Somogyi's counsel "vigorously opposed" the motion, arguing, among other things, that the New York judgment was not entitled to full faith and credit in New Jersey because it had been obtained on a personal guarantee fraudulently procured from Somogyi. Nevertheless, the Superior Court ruled that summary judgment should be granted against Somogyi. An order was entered on February 4, 1980, four days after the filing of the federal complaint, awarding judgment in favor of the Butler Trustees in the amount of $31,200.97, together with interest. (Defendants' Exhibit U). That judgment is currently on appeal in the Appellate Division of the Superior Court of New Jersey. (Defendants' Exhibit V).

II.

Plaintiff contends, in Counts 1 and 2 of his complaint, that in the course of selling the assets and good will of the Buffalo dealership, renting the dealership premises, and issuing a Volkswagen dealership franchise, defendants violated a number of provisions of the federal securities laws. In particular, plaintiff alleges violations of Section 17(a) of the 1933 Act, 15 U.S.C. § 77q, Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5.[11]

---

10. The current status of the New York action, according to the Butler Trustees' New York counsel, Victor C. Silverstein, is as follows:

"The judgments obtained by the Butler Trustees in the amount of $31,200.97 and $17,700.27 total $48,901.24. Although the first cause of action of the original complaint in the New York action seeks damages against SVW in the amount of $51,757.33 it was stipulated that the two judgments obtained in the New York action constitute *full* judgment on the first cause of action and, except for the claim for attorneys' fees in the amount of $12,939.33, is also *full* judgment on the third cause of action. The second and third causes of action for attorneys' fees in the amount of $12,939.33 as well as the claim for additional rent sought in the Butler Trustees' Supplemental Complaint remain unadjudicated."

11. Plaintiff also alleges violations of § 15 of the 1933 Act, 15 U.S.C. § 77*o*, Sections 15(c), 20(a & b) and 29(b) of the 1934 Act, 15 U.S.C. §§ 78*o*

Defendants move to dismiss these counts for failure to state a claim under the federal securities laws. In light of the extensive materials outside the pleadings which have been submitted by both parties and not excluded from consideration, the motion will be treated as one for summary judgment.[12]

The question presented is whether one who purchases the assets of a business for cash, simultaneously incorporating the business and issuing to himself the bulk of the capital stock, is entitled to a fraud action against the seller of the business under the federal securities laws.

Section 17(a) of the 1933 Act provides that "[i]t shall be unlawful for any person in the offer or sale of securities" to engage in fraudulent acts or practices, misrepresent material facts or omit to state material facts. Section 10(b) of the 1934 Act provides that "[i]t shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in contravention of rules promulgated by the Securities and Exchange Commission. Rule 10b–5 specifies a number of deceptive acts and practices rendered illegal by Section 10(b) "in connection with the purchase or sale of any security."

The United States Supreme Court has established several guiding principles relative to the coverage of the federal securities laws. On the one hand, the Court has held, the securities laws "must be read flexibly, not technically and restrictively," and may be invoked to remedy a wide range of deceptive acts and practices merely "touching" the sale or purchase of securities. *Superintendent of Insurance v. Bankers Life & Casualty Company*, 404 U.S. 6, 12–13, 92 S.Ct. 165, 168–170, 30 L.Ed.2d 128 (1971); *see also Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972); *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963). On the other hand, the Court has held, not every transaction falling within the literal language of the statutes is covered. "Congress intended the application of these statutes to turn on the economic realities underlying a transaction, not on the name appended thereto." The task falls "ultimately to the federal courts," by looking to the background and purpose of the Acts, "to decide which of the myriad financial transactions in our society come within the coverage of these statutes." *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848–49, 95 S.Ct. 2051, 2058–59, 44 L.Ed.2d 621 (1975). Furthermore, despite the remedial purpose of the securities laws, a provision is not to be read "more broadly than its language and statutory scheme will permit." *Aaron v. SEC*, 446 U.S. 680, 695, 100 S.Ct. 1945, 1955, 64 L.Ed.2d 611 (1980); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 2490, 61 L.Ed.2d 82 (1979).

Bearing these principles in mind, and resolving all inferences in plaintiff's favor, I conclude that the transaction involved here does not fall within the coverage of the federal securities laws.

Plaintiff relies upon an elaborate chain of reasoning in support of his securities laws claims. First, he contends, the issuance of capital stock by Somogyi Volkswagen, Inc. constituted a sale of securities, within the

(c), 78t(a & b) and 78cc(b), and SEC Rules 170 and 15c1–9, 17 C.F.R. §§ 230.170 and 240.-15c1–9.

Section 15 of the 1933 Act and Section 20 of the 1934 Act are "controlling person" provisions and presuppose a violation of a substantive provision of the Acts. Similarly, Section 29(b) of the 1934 Act, a remedial measure providing for the voiding of unlawful contracts, presupposes a violation of a separate provision of the Act.

Section 15(c) of the 1934 Act and SEC Rules 15c1–9 apply to brokers and dealers in securities and are not relevant to this action. SEC Rule 170 is also inapplicable in this case.

12. Summary judgment is more appropriate in any event in light of the Third Circuit's suggestion that "only through examining all the facts and circumstances surrounding [an] agreement [can] the Supreme Court's mandate to emphasize economic reality be given full effect." *Lino v. City Investing Co.*, 487 F.2d 689 (3d Cir. 1973).

meaning of the Acts, of which he was the purchaser. *See Eason v. General Motors Acceptance Corp.*, 490 F.2d 654, 656 (7th Cir. 1973) (overruled on other grounds by *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 748, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975)); *Hooper v. Mountain States Securities Corp.*, 282 F.2d 195, 202–203 (5th Cir. 1960). Second, he argues, although defendants were not technically the "sellers" of the securities, defendant Edward J. Butler, Jr.'s agreement to personally guarantee the Liberty National Bank loan of $100,000, without which the sale would not have been possible, rendered him a "joint venturer" with Somogyi and hence the equivalent of a "seller". *See Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692–93 (5th Cir. 1971). Third, he argues, while no misrepresentations were made regarding the value of the securities he purchased, the overall transaction "falls into the category of cases which involve decisions infected with fraud and manipulation relating to the value of assets given in exchange [for securities] or purchased through a securities transaction." (Plaintiff's Brief at 18). *See Eason v. General Motors Acceptance Corp., supra* at 656; *Movielab, Inc. v. Berkey Photo, Inc.*, 321 F.Supp. 806 (S.D.N.Y.1970), *aff'd* 452 F.2d 662 (2d Cir. 1971); *Hooper v. Mountain States Securities Corp., supra.* Finally, he

claims, the necessary causal relationship between defendants' allegedly fraudulent activities and his purchase of securities can be found in the fact that he was "required" by the World-Wide Volkswagen *pro forma* and the purchase and sale agreement signed in April, 1976 to form a corporation.

Defendants contend, quite simply, that the securities laws counts of plaintiff's action must fail because (1) the overall transaction entered into between plaintiff and defendants did not involve the purchase or sale of any "security" within the meaning of the securities laws, and (2) the transaction fails to satisfy the "in connection with" requirement of the securities laws.[13]

In arguing that the transaction by which plaintiff purchased the assets of Butler Volkswagen, Inc., rented the premises, acquired a franchise and incorporated the business was not a "securities transaction," defendants look to the Supreme Court's requirement in *United Housing Foundation, Inc. v. Forman, supra*, that a transaction be analyzed in light of its "economic realities". In *Forman*, the Court held that the "basic test" for distinguishing a transaction covered by the securities laws from other commercial dealings is " 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.' " *Id.* 421 U.S.

**13.** With regard to plaintiff's claims under Section 17(a), defendants advance two additional arguments for dismissal. First, they argue, Section 17(a) applies only to frauds committed by "sellers" of securities and, while Somogyi may have purchased securities, they were clearly not the sellers. *See Aaron v. SEC, supra* 446 U.S. at 687, 100 S.Ct. at 1950–1951 (Section 17(a) "applies only to sellers"); *Crowell v. Pittsburgh & Lake Erie Railroad Co.*, 373 F.Supp. 1303, 1311 (E.D.Pa.1974); *Financial Programs, Inc. v. Falcon Financial Service*, 371 F.Supp. 770, 775 (D.Or.1974). Second, they argue, no private right of action exists under Section 17(a), a question left open thus far by the Supreme Court and this Circuit. *See Blue Chip Stamps v. Manor Drug Stores, supra* 421 U.S. at 733–34, n. 6, 95 S.Ct. at 1924, n. 6; *Schultz v. Cally*, 528 F.2d 470, 475, n. 11 (3d Cir. 1975).

Defendants' arguments with respect to the "in connection with" requirement and the definition of a "security transaction," however, ap-

ply with equal force to Section 17(a). The Supreme Court noted in *United States v. Naftalin*, 441 U.S. 768, 773, n. 4, 99 S.Ct. 2077, 2081, n. 4, 60 L.Ed.2d 624 that Section 17(a)'s "in" and Section 10(b)'s "in connection with" have been used interchangeably by both Congress and the Supreme Court. In *United Housing Foundation, Inc. v. Forman, supra* 421 U.S. at 847, n. 12, 95 S.Ct. at 2058, n. 12, the Court noted that: "The definition of a security in § 3(a)(1) of the 1934 Act ... is virtually identical [to that in § 2(1) of the 1933 Act] and, for present purposes, the coverage of the two acts may be considered the same." *See also Weaver v. Marine Bank*, 637 F.2d 157, 160, n. 2 (3d Cir. 1980). In light of my conclusion that the transaction involved here does not fall within the coverage of the securities laws, it is not necessary to address the additional questions whether defendants were "sellers" and whether a private right of action exists under Section 17(a) of the 1933 Act.

at 852, 95 S.Ct. at 2060, *quoting SEC v. W. J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). Defendants contend that plaintiff's acquisition of the shares of Somogyi Volkswagen, Inc., because it constituted an investment in an enterprise whose profitability depended upon his own efforts and not the efforts of others, was not a "securities transaction" covered by the federal securities laws.

While the circumstances of this case are novel, strong support for defendants' argument can be found in a line of recent cases holding that one who purchases a business by acquiring 100% of its stock is not entitled to an action against the seller of the stock under the federal securities laws. *E. g., Frederiksen v. Poloway*, 637 F.2d 1147 (7th Cir. 1981); *Chandler v. Kew*, CCH Sec. L.Rep. [1979 Transfer Binder], ¶ 96,966 (10th Cir. 1977); *Anchor-Darling Industries, Inc. v. Suozzo*, 510 F.Supp. 659 (E.D.Pa.1981); *Barsy v. Verin*, 508 F.Supp. 952 (N.D.Ill.1981); *Dueker v. Turner*, CCH Sec.L.Rep. [1980 Transfer Binder], ¶ 97,386 (N.D.Ga.1979); *but see Mifflin Energy Sources, Inc. v. Brooks*, 501 F.Supp. 334 (W.D.Pa.1980); *Titsch Printing, Inc. v. Hastings*, 456 F.Supp. 445 (D.Colo.1978). These cases proceed upon the theory that the "stock sale" of a business, although facially involving the transfer of securities, is not in "economic reality" the type of transaction to which Congress intended the securities laws to apply. One who acquires complete control of a business by acquiring all of its stock does not rely upon the entrepreneurial efforts of others to obtain profits, but solely upon his own efforts and those of any employees, managerial or otherwise, whom he chooses to hire. Since the day-to-day management of the corporation lies in the hands of the purchaser, the stock trans-

ferred amounts to a mere vehicle for the transfer of assets and an "index of ownership" of the purchased corporation, not an "investment of money in a common enterprise with profits to come solely from the efforts of others." *United Housing Foundation, Inc. v. Forman, supra* 421 U.S. at 852, 95 S.Ct. at 2060.

■ If a "stock purchase" of a corporation is not, in economic reality, the type of transaction to which the securities laws were intended to apply, it follows *a fortiori* that plaintiff Somogyi's "assets purchase" and contemporaneous formation of a new corporation is not a covered "securities transaction". It is undisputed that plaintiff, in return for his capital contribution to Somogyi Volkswagen, Inc., received well over 90% of the shares of the new corporation.[14] Armed with this controlling interest, plaintiff had the right to exercise complete control over the day-to-day activities of the business. Whether he chose to delegate the dealership's management to one or more employees or operate the business himself, the profitability of the business depended upon his own entrepreneurial efforts and ability, not that of others.

■ Indeed, the economic realities of plaintiff's "assets purchase" and incorporation lie at an even farther remove from the traditional concerns of the federal securities laws than the transactions involved in the "stock purchase" cases. Here, although plaintiff did acquire shares of stock, he did not acquire them from defendants. In effect, he issued the shares to himself as a means of limiting his liability to creditors and to the public at large.[15] Whether plaintiff had chosen to form a corporation or not, he clearly would have been required to invest the same amount of capital in the Volkswagen dealership as a condition of obtaining the franchise. By incorporating,

---

14. Plaintiff states in his affidavit that he contributed $140,000 of Somogyi Volkswagen Inc.'s capital and Mohacsi contributed an additional $8,000, thus giving him a 94.6% interest in the corporation.

15. This is so notwithstanding the financial assistance provided by Edward J. Butler, Jr. By guaranteeing Liberty National Bank's $100,000

loan to Somogyi, the proceeds of which Somogyi used to contribute his share of Somogyi Volkswagen, Inc.'s initial capital, Butler arguably invested in *Somogyi's* new enterprise. *Cf. Weaver v. Marine Bank, supra.* Somogyi did not, by virtue of Butler's loan guarantee, become an investor in any activities engaged in by Butler.

plaintiff did not increase his risk by placing his money in the hands of others; rather he reduced his risk by limiting his liability. Hence, even though plaintiff may technically argue that he was a "purchaser" of statutorily defined "securities," he cannot, under *Forman's* "economic realities" test, be said to have engaged in the type of transaction to which Congress intended the securities laws to apply.[16]

Plaintiff argues that *Forman's* "economic realities" test should be applied not to the nature of an overall commercial transaction but only to the character of a specific contract or instrument employed by the parties in a commercial transaction. Thus, in *Forman* itself, plaintiff points out, the so-called "shares of stock" in question possessed none of the ordinary characteristics of stock instruments: they did not confer the right to receive dividends or to vote in proportion to the number of shares owned, they were not negotiable and they could not appreciate in value. By contrast, plaintiff argues, the shares of Somogyi Volkswagen, Inc. which he "purchased" were unquestionably traditional stock instruments bearing all the characteristics ordinarily associated with securities. Because the instruments he acquired were "securities" in economic reality as well as in name, plaintiff concludes, he should be permitted to bring an action against defendants for fraud whether or not the securities were acquired in a traditional investment transaction. *See Mifflin Energy Sources, Inc. v. Brooks, supra* and *Titsch Printing, Inc. v. Hastings, supra.*

Plaintiff's argument, however, will not stand. While the Supreme Court began its analysis in *Forman* by examining the definition of a "security" under the 1933 and 1934 Acts, it unquestionably extended its analysis to the broader question whether the entire transaction bore the characteristics essential to coverage under the securities laws. "There may be occasions," the Court held, "when the use of a traditional name such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying *transaction* embodies some of the significant characteristics associated with the named instrument." *Id.* 421 U.S. at 850–51, 95 S.Ct. at 2059–60 (emphasis added). Here, however, the Court held that "the disputed *transactions* [were] not purchases of securities within the contemplation of the federal statutes." *Id.* at 847, 95 S.Ct. at 2058 (emphasis added). The Court's focus was clearly upon the nature of the commercial arrangement in which an instrument is transferred, not solely upon the legal characteristics of the instrument itself, taken in abstraction. *See Anchor-Darling Industries, Inc. v. Suozzo, supra* 510 F.Supp. 659.

Even if plaintiff's acquisition of shares in Somogyi Volkswagen, Inc. were one of those transactions whose "economic realities" fall within the coverage of the federal securities laws, I conclude, as an additional ground for dismissal of the federal securities laws claims, that the fraud alleged was not "in connection with" the purchase or sale of securities.

In *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* the Supreme Court held that the federal securities laws could be invoked to remedy fraudulent

**16.** For substantially the same reasons that plaintiff's acquisition of stock in Somogyi Volkswagen, Inc. cannot be considered a "securities transaction" within the meaning of the federal securities laws, no other aspect of the commercial dealings between Somogyi, Butler, the Butler Trustees and World-Wide Volkswagen may be considered a "securities transaction" either. The Third Circuit has held in *Lino v. City Investing Co.,* 487 F.2d 689 (3d Cir. 1973), cited with approval by the Supreme Court in the *Forman* case, 421 U.S. at p. 849, 95 S.Ct. at 2059, that one who purchases a franchise may not bring an action under the federal securities laws against the franchisor if he is required by the franchise agreement to undertake more than "nominal or insignificant" efforts in managing his franchise. It is equally clear that neither the lease and lease guarantee taken separately, nor the entire commercial arrangement constitute one of the "myriad financial transactions in our society [which] come within the coverage" of the securities laws. *Forman, supra* at 848, 95 S.Ct. at 2058. In no part of the overall transaction did plaintiff make an investment in a common enterprise, the profits of which were to come from the efforts of others.

practices "touching" upon the sale or purchase of securities, even though the fraud was not directed to the value of the securities themselves.[17] Since that time, courts have given a broad application to the "in connection with" requirement. Whether wisely or unwisely, for example, it has been held in this and other circuits that an action lies under the securities laws for fraud relating to the value of assets given in exchange for securities, even though no misrepresentations have been made with respect to the securities themselves.[18] *E. g., Weaver v. Marine Bank,* 637 F.2d 157, 163–65 (3d Cir. 1980); *Lino v. City Investing Co.,* 487 F.2d 689, 694 (3d Cir. 1973); *Eason v. General Motors Acceptance Corp.,* 490 F.2d 654, 656 (7th Cir. 1973). The Third Circuit recently observed that "[a]lmost without exception, [courts] have found compliance with the 'connection' requirement even where fraudulent conduct is implicated only tangentially in a securities transaction." *Ketchum v. Green,* 557 F.2d 1022, 1026 (3d Cir. 1977).

Nevertheless, the "connection" requirement of the securities laws is not without limits. In *Ketchum v. Green, supra,* the Third Circuit explicitly considered the boundaries of the requirement and found them to have been exceeded even though an identifiable causal relationship existed between the fraud claimed and the purchase and sale of securities.

In *Ketchum,* defendants succeeded, allegedly by fraud, in acquiring a dominant position upon a company's board of directors. Once they acquired control of the board, defendants voted to oust plaintiffs as officers of the company. Pursuant to a previously negotiated stock retirement agreement, plaintiffs then became contractually obligated to redeem their shares in the corporation at a bargain price.

Looking to *Superintendent of Insurance v. Bankers Life & Casualty Co., supra,* "as the precedent with which we must concern ourselves," the Third Circuit observed that the teachings of that case are "hardly refined or capable of facile application." *Id.* at 1027. Nevertheless, it found in the facts of *Bankers Life* a "fairly tight linkage" between "the securities transaction and the claimed fraud." On the facts before it, by contrast, the court found the "degree of proximity" between the alleged fraud and the forced sale of securities to be "more attenuated". The alleged fraud, "[i]nstead of being merely one step away from a securities deal," was "somewhat removed from the ultimate transaction." *Id.* at 1028. Moreover, the court found, to the degree that causation was relevant to the "connection" requirement, *see Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187 (3d Cir. 1976), the chain of causation between the alleged fraud and the ultimate sale of securities was interrupted by independent, intervening causative events. *Id.* at 1029.

In this case, as in *Ketchum,* the degree of proximity between the fraud alleged to have been committed by defendants in connection with the sale of the assets of Butler Volkswagen, Inc. and plaintiff's formation of a corporation for the purpose of limiting his liability in connection with the purchased business can only be described as "attenuated". Although plaintiff claims

**17.** In *Bankers Life,* defendant Begole sold bonds in a legitimate market transaction involving no misrepresentations to the purchasers. He then fraudulently disposed of the proceeds. Justice Douglas held that: "Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b), whatever might be available as a remedy under state law." *Id.* 404 U.S. at 12, 92 S.Ct. at 169.

**18.** There is an obvious tension between this line of cases and the Supreme Court's mandate in *Forman* that the securities laws be construed in light of their background and purpose. A "fundamental purpose" of the securities laws was to "substitute a philosophy of full disclosure for the philosophy of *caveat emptor*" because "the doctrines of fraud and deceit which developed around transactions involving land and other tangible items of wealth [were] illsuited to the sale of such intangibles as advice and securities ..." *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 194, 84 S.Ct. 275, 280, 284, 11 L.Ed.2d 237 (1963). It is anomalous to apply this high standard of honest dealing to the sale of an asset merely because a security is given in exchange.

that the purchase and sale agreement he signed with defendants "required" him to form a corporation, it is clear on the face of the documents that he was not required to do so.[19] The references in the agreement to "the Buyers or a corporation to which the Buyers shall form" clearly indicate that the parties contemplated the formation of a corporation by the purchasers and intended to preserve the buyers' option to acquire the assets and enter a lease in a corporate as well as an individual capacity. Nowhere in the agreement, however, is the formation of a corporation made mandatory. The benefits to plaintiff in forming a corporation and thus limiting his liability were obvious. There is no indication that his decision to do so was anything but unilateral.

That plaintiff might never have formed a corporation "but for" defendants' allegedly fraudulent sale of the assets of Butler Volkswagen, Inc. does not resolve the connection issue. Plaintiff's formation of a corporation and issuance to himself of the bulk of its capital stock was, like the *Ketchum* plaintiffs' ultimate redemption of their stock, too many steps removed from defendants' alleged fraud to meet the "connection" requirement of the federal securities laws.

In summary, I find that plaintiff's claims do not fall within the coverage of the federal securities laws. Viewing the facts in the light most favorable to plaintiff, the transaction by which plaintiff acquired shares in Somogyi Volkswagen, Inc. was not, in economic reality, the type of transaction to which the securities laws were intended to apply since the profitability of the business depended upon plaintiff's entrepreneurial efforts, not that of others. Even if the transaction were one within the scope of the securities laws, the nexus between the alleged fraud and the ultimate issuance of securities was too attenuated to satisfy the requirement that the fraud take place "in connection with" the purchase or sale of securities. As a matter of law, therefore, defendants are entitled to judgment on Counts One and Two of the complaint.[20]

### III.

In the only remaining count of his complaint, Count Three, plaintiff alleges that in the course of selling the assets and good will of the Buffalo dealership, renting the dealership premises, obtaining a lease guarantee and issuing a Volkswagen dealership franchise, defendants committed fraud under the common law of New York and New Jersey.

Plaintiff asserts jurisdiction over these claims under the court's pendent jurisdiction and diversity of citizenship of the parties. In view of the fact that plaintiff's federal claims have been dismissed before trial, I will decline to exercise pendent jurisdiction over the state claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Jurisdiction over the state claims, therefore, must rest upon diversity of citizenship alone.[21]

Defendants move to dismiss the balance of plaintiff's complaint on *res judicata* grounds. Since they obtained a final and unappealed judgment in the courts of New York against plaintiff on the lease guarantee agreement, defendants contend, and plaintiff failed to raise a defense of fraud

19. The construction of a written contract which is unambiguous as to its terms is a question of law to be decided by the court. *Gray v. Joseph J. Brunetti Construction Co.*, 266 F.2d 809, 813 (3d Cir. 1959). Merely because "counsel [argue] different conclusions from the evidentiary material" does not create a material issue of fact. *Goldinger v. Boron Oil Co.*, 375 F.Supp. 400, 413 (E.D.Pa.1974), *aff'd without opinion*, 511 F.2d 1393 (3d Cir. 1975).

20. In light of this resolution, it is unnecessary to address defendants' claims that the securi-

ties laws counts of the complaint are barred by the statute of limitations.

21. While plaintiff has failed to establish the minimum jurisdictional facts necessary to support his claim of diversity jurisdiction, it does not appear in the record that any of defendants are citizens of New Jersey, nor have defendants raised lack of diversity jurisdiction as a defense. *Cf. Schultz v. Cally*, 528 F.2d 470 (3d Cir. 1975).

in that action, plaintiff is now barred from pursuing an action for fraud against them in the present action.

■ In evaluating the effect of a prior judgment under the doctrine of *res judicata*, the Full Faith and Credit statute, 28 U.S.C. § 1738, requires that the law of the rendering state be applied. *See St. John v. Wisconsin Employment Relations Board*, 340 U.S. 411, 71 S.Ct. 375, 95 L.Ed. 386 (1951); *see generally* 18 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4469 (1981). Defendants' key contention is that, under the law of New York, once a judgment has been obtained on a contract, the validity of the contract is impliedly established and may not be challenged in a subsequent action by a party to the first action. Since plaintiff failed to raise the defense of fraud in their action on the lease and lease guarantee contracts, defendants argue, he is barred from bringing the present action on the ground that these and other agreements were obtained by fraud.

It has been established that "under the New York concept of *res judicata* a prior judgment is conclusive upon the parties in any subsequent action involving the same cause of action not only as to those issues which were actually litigated but also as to any issues which might have been, but were not, litigated in the earlier action." *Winters v. Lavine*, 574 F.2d 46, 56 (2d Cir. 1978). In contract actions, this doctrine has been applied to bar subsequent suits not only by plaintiffs but also by defendants who could have, but did not, raise claims or defenses relating to the contract in the first action. *See, e. g., Ripley v. Storer*, 309 N.Y. 506, 132 N.E.2d 87 (1956); *Adamik v. Adamik*, 190 Misc. 851, 75 N.Y.S.2d 824 (Sup.Ct. Broome Cty. 1948).[22] Key to the application of this form of "claim preclusion," however, is an identity between the "causes of action" litigated in the first and second suits. The courts of New York have held that the two actions must have "such a measure of iden-

tity that a different judgment in the second would destroy or impair rights or interests established by the first." *Schuylkill Fuel Corp. v. B & C Nieberg Realty Corp.*, 250 N.Y. 304, 306–307, 165 N.E. 456, 457 (1929); *see also Ripley v. Storer*, 132 N.E.2d, *supra* at 90. If "the two lawsuits are not predicated on 'identical' causes of action," *res judicata* does not apply but "the New York concept of collateral estoppel comes into play." *Winters v. Lavine, supra* at 56. The doctrine of collateral estoppel, or "issue preclusion," "bars the relitigation of any issue which would be decisive in the later action and which was [actually] litigated and decided against the litigant in the earlier action." *Id.; see also Smith v. Kirkpatrick*, 305 N.Y. 66, 11 N.E.2d 209 (1953).

■ Here, plaintiff claims fraud not only with respect to the lease and lease guarantee agreements, but also with respect to the purchase and sale agreement pursuant to which he purchased the assets and good will of Butler Volkswagen, Inc. While there may be some issues common to both suits, the actions are clearly not "identical." The rights and liabilities of the parties under the purchase and sale agreement and the lease agreements are separate and independent from one another. Although the signing of a lease was made a condition of the purchase and sale of the business, a valid purchase and sale agreement was not a condition of the lease. Moreover, the parties to the two contracts were different. The seller of the business was Butler Volkswagen, Inc., represented by its sole shareholder, Edward J. Butler, Jr.; the lessor of the premises was the Butler Trust. Finally, the agreements were clearly preceded by different negotiations and representations as to price and other terms of the bargain.

The New York cases relied upon by defendants for the proposition that one who could have, but did not, raise claims or defenses relating to a contract in an earlier

---

**22.** Under New York procedural law, all counterclaims are permissive. New York CPLR § 3019; *see* Siegel's Practice Commentary, 7B McKinney's Consolidated Laws of New York Annotated, C 3019:1. Because plaintiff was not subject to a compulsory counterclaim requirement, defendants rely solely upon the common law of *res judicata* with respect to the New York judgment.

action is barred from challenging the validity of the contract in a subsequent action presuppose actions based upon the same contract. *See Ripley v. Storer*, 132 N.E.2d, *supra* at 93 and cases cited therein. Here, the second action involves an agreement whose validity was not essential to the initial judgment. Assuming that the doctrine of collateral estoppel will apply to bar the relitigation in the present action of any issues of fact and law previously decided in the New York action, a different judgment in the second action will not "destroy or impair rights or interests established by the first." *Schuylkill Fuel Corp. v. B & C Nieberg Realty Corp., supra.* The precise issues to be given collateral estoppel effect, however, cannot be determined at this stage of the proceedings.

For the foregoing reasons, defendants' motion to dismiss the complaint on *res judicata* grounds will be denied.[23] Having stated a claim for common law fraud in the sale of the assets of Butler Volkswagen, Inc., plaintiff is entitled to a trial on the Third Count of his complaint despite defendants' earlier recovery of a judgment on the lease guarantee agreement for rent due under the lease.

Defendants also move for summary judgment on their first counterclaim, based upon the judgments they obtained against plaintiff in the state courts of New York and New Jersey in the total amount of $48,901.24. In view of the fact, however, that the court which originally entered these judgments has seen fit to enter a stay, I do not believe it is appropriate at this juncture to enter an order enforcing those judgments. The motion for summary judgment on the first counterclaim will therefore be denied, without prejudice.

Defendants' attorneys are requested to submit a form of order consistent with this opinion.

23. Defendants also claim that this action is barred by the judgment they obtained in the New Jersey enforcement action since defendants in New Jersey are subject to a compulsory counterclaim requirement. *See New Jersey Court Rules* 4:27–1(b) and 4:7–1. Plaintiff did,

however, raise his claim of fraud in his answer in the New Jersey action and was expressly permitted by court to file this federal action. Under the circumstances, plaintiff cannot be said to have failed to comply with the compulsory counterclaim rule.