NIEDERHOFFER, CROSS & ZECKHAU-
SER, INC., Plaintiff,

v.

TELSTAT SYSTEMS INC. and William
Stern, Defendants.

No. 76 Civ. 5500 (WCC).

United States District Court,
S. D. New York.

July 27, 1977.

Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiff; John W. Herz, David A. Ruttenberg, Robert L. Davidson, New York City, of counsel.

Aranow, Brodsky, Bohlinger, Benetar & Einhorn, New York City, for defendants; Leonard Holland, George Berlstein, Terence L. Blackburn, New York City, of counsel.

CONNER, District Judge.

Plaintiff in the above-captioned action sues defendant Telstat Systems Inc., and its Executive Vice-President William Stern, for $500,000 in damages, allegedly the result of defendant's fraudulent activities in connection with plaintiff's "contract to purchase securities." Counts I and II of the complaint allege violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 of the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5; jurisdiction is founded upon § 27 of the 1934 Act, 15 U.S.C. § 78aa. The remaining three counts allege "common law" causes of action and invoke the Court's pendent jurisdiction. Presently before the Court is defendant Telstat's motion, pursuant to Rules 12(b)(1) and (6), F.R.Civ.P., to dismiss the complaint for lack of jurisdiction over the subject matter and for failure to state a claim upon which relief can be granted.

■ Plaintiff is a finder in the field of corporate acquisitions; its business, according to the complaint, is to provide services to companies interested in having their assets acquired by others. Defendant is a New York State corporation which allegedly engaged plaintiff's services in November of 1975. The terms of that engagement were not reduced to writing, but, under the oral agreement as alleged, plaintiff was engaged "to obtain a buyer interested in acquiring the defendant corporation by a purchase of its stock or assets or by a merger or consolidation." Plaintiff was informed by defendant that it was "seeking stock of a publicly held company with a value of $15 to $17, to be exchanged for each share of the defendant corporation's stock then outstanding." In the event of an acquisition, defendant agreed to transfer to plaintiff, as payment for its services, "a portion of the securities" received from the buyer.[1]

---

1. For the purposes of the present motion, all of the material allegations of plaintiff's complaint must be deemed to be true. *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); *Escalera v. New York City Housing Authority*, 425 F.2d 853, 857 (2d Cir. 1970), cert. denied, 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970); see *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967). Nevertheless, in both its original and reply memoranda in support of the motion to dismiss, defendant has insisted upon challenging plaintiff's factual recital that its remuneration on the contract was to be in securities (Defendant's Memorandum at 7; Defendant's Reply Memorandum at 2–3). According to defendant, the form of plaintiff's remuneration might have been either cash or securities depending upon the terms of the acquisition. Plaintiff's complaint and supporting memorandum are to the contrary. Neither states that Telstat's acquisition could have been structured as a cash purchase, and both assert, unequivocally, that the fee due plaintiff under the contract was to take the form of a transfer of securities. Following the applicable

Encouraged by defendant to expend its time, effort and funds in locating a buyer, plaintiff prepared detailed reports describing defendant's business and operations, disseminated the reports to prospective buyers whom plaintiff had selected, arranged and participated in meetings between defendant and interested buyers and rendered advice and counsel to defendant as to methods and strategies by which it could obtain a favorable offer.

The acquisition of defendant was accomplished in June of 1976—plaintiff, however, was not responsible for the introduction of the buyer-corporation to defendant and was denied any compensation. As the basis for recovering damages under the federal securities laws, plaintiff contends that defendant fraudulently misrepresented its intentions at the time of entering into the oral agreement of November 1975.

Two theories of fraud are alleged, resting upon differing versions of the November 1975 agreement. The first, rather nebulously drawn, is set forth in Count I. It alleges an agreement between the parties whereby plaintiff would be entitled to a fee, in the form of securities in the acquiring corporation, upon defendant's acquisition by "a buyer," whether or not introduced to defendant by plaintiff. The fraud is said to rest in the fact that, at the time of entering into the agreement, defendant's undisclosed intention was to pay the fee

only in the event of plaintiff's serving as the actual finder in the transaction.

According to Count II, the agreement provided for plaintiff's entitlement to a fee in the event that it actually served as the finder of the acquiring corporation. The fraud alleged here is twofold. First, defendant failed to disclose, at the time that the parties entered into their contract, that defendant had resumed acquisition negotiations with the Western Union corporation. Second, during the period of several months following the agreement, defendant failed to disclose its final determination to consummate the acquisition with Western Union, rather than with one of plaintiff's buyers. Pursuant to a fraudulent scheme, it consciously exploited plaintiff's advice and services as a means of obtaining a more favorable offer from Western Union.

Under both counts, plaintiff alleges that the fair and reasonable value of its work, labor and services was $500,000 and claims that amount as damages.

Plaintiff is aware of the "purchaser-seller" limitation upon private damage actions brought under § 10(b) of the Securities Exchange Act of 1934.[2] *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). The section extends its protection to only the defrauded purchaser or seller of securities, and plain-

---

law, we assume the contract to be as alleged in the complaint.

**2.** Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

The Securities and Exchange Commission Rule implementing the Section, Rule 10b–5, 17 C.F.R. § 240.10b–5, provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

tiff was neither under the facts as presented in the complaint. Section 3(a)(13) of the Act, 15 U.S.C. § 78c(a)(13), however, defines the terms "buy" and "purchase" to include "*any contract* to buy, purchase or otherwise acquire." (Emphasis added.) Plaintiff contends that since its finder's fee was payable in securities under the oral agreement with defendant Telstat, it was a contractual purchaser possessing the requisite standing to sue under § 10(b).

Section 3(a)(13) is obviously sweeping in its breadth. Within its purview are contracts not only to purchase, but "otherwise [to] acquire" securities as well. Assuming the existence of an enforceable contract between the parties,[3] we are of the view that plaintiff was the holder of such a contractual right under its employment agreement with Telstat. *Cf. Collins v. Rukin,* 342 F.Supp. 1282 (D.Mass.1972); *S.E.C. v. Addison,* 194 F.Supp. 709, 716, 722 (N.D. Tex.1961); *Truncale v. Blumberg,* 80 F.Supp. 387, 392 (S.D.N.Y.1948).[4] Thus, were status as a statutory "purchaser" under § 10(b) dependent upon no more than a literal reading of statutory language, plaintiff would possess the requisite standing to sue.

More, however, is required. The boundaries of the purchaser-seller requirement are, and always have been, tied to the purposes underlying § 10(b). *Herpich v. Wallace,* 430 F.2d 792, 806–07 (5th Cir. 1970); see *S.E.C. v. National Securities,* 393 U.S. 453, 466–67, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *International Control Corp. v. Vesco,* 490 F.2d 1334, 1345 (2d Cir. 1974). Indeed, only recently, in *Santa Fe Industries v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court emphasized the importance of ascertaining the congressional purposes underlying the statute as a means of defining the scope of the implied private right of action under § 10(b); it said, specifically, that "[a]lthough [it had] recognized an implied cause of action under that section in some circumstances * * * [it had] also recognized that a private cause of action under the antifraud provisions of the Securities Exchange Act should not be implied where it is 'unnecessary to ensure the fulfillment of Congress' purposes' in adopting the Act." Certainly in the light of *Green,* and prior case law cited *supra,* the judicial eye must remain focused upon the congressional concerns behind § 10(b) in the determination of the issue of a plaintiff's standing to sue.

The Section was aimed at manipulative and deceptive devices employed "in connection with the purchase or sale of any security" and contravening the rules and regulations established by the Securities

---

**3.** Although not noted by defendant itself, there are obviously serious questions as to the enforceability of a contract whose compensation term is left as indefinitely as "a portion of the securities" of the acquiring corporation. See, e. g., *Von Reitzenstein v. Tomlinson,* 249 N.Y. 60, 162 N.E. 584 (1928); *Varney v. Ditmars,* 217 N.Y. 223, 111 N.E. 822 (1916); 1 Corbin on Contracts § 97; 1 Williston on Contracts § 41. Enforceability ultimately hinges, however, upon the parties' manifestation of contractual intent and the availability of an extrinsic standard for rendering the indefinite term certain. See, e. g., *Lee v. Joseph E. Seagram & Sons, Inc.,* 552 F.2d 447, 453 (2d Cir. 1977); 1 Corbin on Contracts §§ 95, 97, 98; 1 Williston on Contracts § 41. Indefiniteness, in other words, may be cured upon the receipt of evidence at the trial. Accordingly, since a complaint must be sustained unless it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), we assume

the alleged contract to be an enforceable one for the purposes of the motion to dismiss. *Cf. Lipsky v. Com. United Corp.,* 551 F.2d 887, 894–97 (2d Cir. 1976).

**4.** Defendant urges a blanket exclusion of employment contracts from the reach of § 3(a)(13), citing *Hiller v. Franklin Mint, Inc.,* 485 F.2d 48 (3d Cir. 1973), and *Baldassarre v. Singer,* 444 Pa. 100, 282 A.2d 262 (1971), cases which did not arise under the securities laws but which, *for purposes of state statutes of frauds,* held contracts of employment and contracts for the sale of securities to be mutually exclusive; in both cases, the courts found that the contracts sued upon were contracts of employment and, therefore, outside the reach of the statute of frauds. We need say only what would appear to be obvious—that the cases cited have absolutely no bearing upon issues arising under § 10(b) of the Securities Exchange Act of 1934.

and Exchange Commission. The rules and regulations, according to the statute, were to be promulgated by the Commission *"in the public interest or for the protection of investors."* (Emphasis added.) See *A. T. Brod v. Perlow*, 375 F.2d 393, 396 (2d Cir. 1967). Rule 10b–5 was adopted pursuant to that statutory direction. SEC Sec.Exch. Act Rel. No. 3230 (May 21, 1942). Thus, the concern underlying the statute, as the Fifth Circuit Court of Appeals observed in *Herpich v. Wallace, supra*, 430 F.2d at 808, is "not * * * so much with fraud per se as * * * with the effect of fraud upon investors and upon the public interest in the maintenance of free and open securities markets nurtured in a climate of fair dealing." See also *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 495 F.2d 228, 235 (2d Cir. 1974); *Crane Company v. Westinghouse Air Brake Company*, 419 F.2d 787, 793 (2d Cir. 1969); *Hooper v. Mountain States Securities Corporation*, 282 F.2d 195, 201–02 (5th Cir. 1960). The body of decisional precedent on the issue of § 10(b) standing reflects that concern. It supports the proposition that the proper litigant under the section, in a private suit for damages, is only one whose suit will serve an "investment interest" or the "public interest" as defined by the special purposes of the 1934 legislation. See *A. T. Brod v. Perlow, supra.*

In the vast majority of cases, "purchasers" and "sellers" for § 10(b) purposes have been owners of rights in identified securities—*i. e.*, investors—faced with the decisions and risks attendant upon that status: the corporate shareholder, for example, exchanging his stock pursuant to a merger [5] or liquidation; [6] the holder of an investment contract, agreeing to substantial modifications in contract terms; [7] the recipient of a stock option, relying upon his employer's prediction of the stock's imminent appreciation in value; [8] the trust beneficiary, potential victim of the trustee's fraudulent management of trust corpus securities; [9] the pledgee of stock pursuant to a loan contract, assuming the "very real investment risk that the pledged securities will have continuing value"; [10] the holder of convertible stock, allegedly induced to forego the exercise of his conversion right; [11] the party placing a sale order with his securities broker, relying upon the broker's good-faith intention to execute the contract; [12] the party entering into a contract to purchase specific corporate securities, relying upon the seller's good-faith intention to follow through with his bargain.[13] The cases cited are illustrative of the fact, first, that the purchaser-seller requirement of

**5.** See, e. g., *S.E.C. v. National Securities*, 393 U.S. 453, 466–67, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969); *Dasho v. Susquehanna Corporation*, 380 F.2d 262 (7th Cir. 1967); *Vine v. Beneficial Finance Company*, 374 F.2d 627 (2d Cir. 1967), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967).

**6.** See, e. g., *Dudley v. Southeastern Factor & Finance Corp.*, 446 F.2d 303 (5th Cir. 1971), cert. denied, 404 U.S. 858, 92 S.Ct. 109, 30 L.Ed.2d 101 (1971); *Coffee v. Permian Corp.*, 434 F.2d 383 (5th Cir. 1970).

**7.** See, e. g., *Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1180–82 (S.D.N.Y.1974). Compare *Abrahamson v. Fleschner*, slip opinion at 6219–20 (2d Cir. February 25, 1977); *Halperin v. Edwards and Hanly*, 430 F.Supp. 121, 124 (E.D.N.Y.1977).

**8.** See, e. g., *Collins v. Rukin*, 342 F.Supp. 1282 (D.Mass.1972).

**9.** See, e. g., *James v. Gerber Products*, 483 F.2d 944 (6th Cir. 1973); *Klamberg v. Roth*, 425 F.Supp. 440 (S.D.N.Y.1976); *Heyman v. Heyman*, 356 F.Supp. 958 (S.D.N.Y.1973); compare *Schoenbaum v. Firstbrook*, 405 F.2d 200, 212 (2d Cir. 1968). See also *Dopp v. Franklin National Bank*, 374 F.Supp. 904 (S.D.N.Y.1974) (beneficial owner of stock pledged as collateral for loan).

**10.** *Mallis v. Federal Deposit Insurance Corporation*, slip opinion at 1209–12 (2d Cir. January 3, 1977), cert. granted, 431 U.S. 928, 97 S.Ct. 2630, 53 L.Ed.2d 243 (1977).

**11.** *Camp v. Genesco*, CCH Fed.Sec.L.Rep. ¶ 95,-679 (S.D.N.Y.1976).

**12.** *Opper v. Hancock Securities Corporation*, 250 F.Supp. 668 (S.D.N.Y.1966), aff'd, 367 F.2d 157 (2d Cir. 1966).

**13.** See, e. g., *Walling v. Beverly Enterprises*, 476 F.2d 393 (9th Cir. 1973); *Commerce Reporting Company v. Puretec, Inc.*, 290 F.Supp. 715 (S.D.N.Y.1968).

§ 10(b) has been liberally construed, its meaning drawn from the concerns underlying the remedial legislation, and, second, that "investment interest" is obviously one crucial touchstone for a plaintiff seeking to invoke the protection of the statute.

Where plaintiffs not classifiable as "investors" have been granted standing under § 10(b), substantial considerations of public interest have been at stake. In *A. T. Brod v. Perlow, supra,* for example, the Court granted standing to a securities broker, against the argument that he was not an "investor," because of his victimization by a fraudulent scheme which, if allowed to continue, would have "exacerbate[d] the very evils that the securities laws were designed to prevent." 375 F.2d at 397. Defendants in *A. T. Brod* had placed purchase orders for securities with a broker with the intent to pay only if their market value appreciated by the settlement date. The Court wrote:

> "Indeed, the Securities and Exchange Commission, as *amicus curiae,* has advised us that the artificial demand created by purchasing securities which are not to be paid for unless the market value of the stock rises, can have an unsettling and potentially manipulative effect on the securities market—contrary to the very purpose of the Act. The practices allegedly engaged in by the Perlows represent a violent form of speculation which serves no useful purpose except that the speculator always holds the trump card. Moreover, the Perlows' activities resulted, in effect, in an involuntary extension of credit without compliance with the margin requirements established pursuant to the Act, 15 U.S.C. § 78g, which restrict the use of credit for speculative purposes."

See also *Carroll v. First National Bank of Lincolnwood,* 413 F.2d 353, 356–57 (7th Cir. 1969), *cert. denied,* 396 U.S. 1003, 90 S.Ct. 552, 24 L.Ed.2d 494 (1970).

*Hooper v. Mountain States Securities Corporation, supra,* was cited in *A. T. Brod* as another illustration of a suit by a non-investor properly brought under § 10(b). 375 F.2d at 396. Plaintiff there was a corporation fraudulently induced into issuing its own stock upon inadequate—indeed worthless—consideration. The dangerous consequence of that species of fraud—public distribution of overvalued or possibly worthless securities—was carefully noted by the Second Circuit in *Ruckle v. Roto American Corporation,* 339 F.2d 24, 28 (2d Cir. 1964), where the Court observed: " \* \* \* it was precisely the fear that such securities would be publicly distributed which prompted Congress to enact the federal securities laws."

■ With the foregoing to guide us, it is clear that plaintiff's claim of § 10(b) standing is without foundation. Plaintiff was neither an investor nor a party whose suit for damages can possibly be viewed as advancing the public interest underlying the statute. Plaintiff was engaged as a finder to select a pool of prospective buyers interested in acquiring the defendant corporation, to educate them as to defendant's business and operations and to arrange for their introduction to defendant. As far as the complaint shows, plaintiff's role then terminated. Its function, therefore, was no more than that of a marriage broker. The final choice of the buyer-corporation was defendant's. Under these circumstances, plaintiff cannot be said to have had an investment interest in the unidentified securities it had contracted to receive upon defendant's acquisition. According to the agreement as alleged in Count I of the complaint, plaintiff was to be paid in the securities of the buyer whether or not it had served as the actual finder in the transaction. In other words, the possibility existed under the contract—and, indeed, materialized in this case—that the buyer would be a corporation which plaintiff had not introduced to defendant and, indeed, with which plaintiff had not had any contact whatsoever. Plaintiff cannot realistically be said to have made an investment decision or to have assumed an investment risk with respect to the securities of such a corporation.

Under the agreement as alleged in Count II of the complaint, plaintiff was entitled to a transfer of securities in the event that it served as the finder of the acquiring corporation. However, in selecting a pool of prospective buyers pursuant to the contract, plaintiff was not acting independently but on behalf of defendant and in accordance with specifications laid down by defendant. Rather than being an investor, plaintiff was simply the agent of another party. And, in the last analysis, the choice of the acquiring corporation from the pool of buyers introduced by plaintiff was solely defendant's prerogative. Thus, plaintiff's performance of its side of the bargain gave it no right or interest in then identifiable securities. Plaintiff was simply not the arbiter of which corporation's stock it would receive and can by no means be said to have possessed an investment interest.

*Collins v. Rukin, supra,* upon which plaintiff relies, involved a very different set of circumstances. The plaintiff there was offered a stock option by the defendant corporation as an inducement to accept employment. In becoming a party to the option contract—through his acceptance of the offer of employment—the plaintiff was banking upon the continued financial health of the corporation. His interest as an investor could hardly have been clearer.

Beyond *Collins,* plaintiff relies upon a number of other "contractual purchaser" cases, in all of which the parties granted standing had bargained to receive the securities of particular corporations or other business entities, but their bargains had been aborted, allegedly because the defendant-sellers had entered into the contractual arrangements with no intention of full performance. *Fenstermacher v. Philadelphia National Bank,* 493 F.2d 333, 336 n. 4 (3d Cir. 1974); *Walling v. Beverly Enterprises,* 476 F.2d 393 (9th Cir. 1973); *Commerce Reporting Company v. Puretec, Inc.,* 290 F.Supp. 715 (S.D.N.Y.1968); [14] *cf. Ohashi v. Verit Industries,* 536 F.2d 849 (9th Cir. 1976); *Allico National Corp. v. Amalgamated Meat Cutters,* 397 F.2d 727 (7th Cir. 1968); *Devonbrook, Inc. v. Lilly Lynn, Inc.,* CCH Fed.Sec.L.Rep. ¶ 95,835 (S.D.N.Y. January 10, 1977). Those cases are simply not controlling here. Each plaintiff was acting in his own behalf—and not as an agent— and was exercising considerable investment discretion in fixing upon particular corporate securities as the object of purchase.

Moreover, in at least four of the cases, the fraudulent practices engaged in raised issues of broad concern under the securities laws. In *Walling,* the defendant was said to have entered into the contract for the purpose of speculating on fluctuations in the price of its stock; in *Ohashi,* the defendant was alleged to have engaged in a manipulative scheme, attempting artificially to raise the price of its publicly traded stock; in *Devonbrook,* the defendant was said to have breached its contractual obligation to register securities which it had transferred to plaintiff; in *Allico,* the defendant was alleged to have misappropriated 25,000 shares of pledged securities, see *Cooper v. North Jersey Trust Company of Ridgewood, N.J.,* 226 F.Supp. 972 (S.D.N.Y. 1964).

The allegations of fraud in the present case, on the other hand, in no way threaten the integrity of securities transactions or markets as such. They simply bespeak frustrations of a private contractual expect-

---

14. The plaintiff's standing in Commerce Reporting was held to derive, first, from its contract of purchase with Purer Corporation, and, second, from its agreement to assign its contractual right to Granite Company (deemed the contractual sale of an investment contract). Contrary to plaintiff's reading of the case, standing was not premised upon the plaintiff's right to acquire 5,000 shares of Granite stock in consideration of its assignment of the Purer contract of purchase. Thus, the case is not one in which federal jurisdiction was grounded in "plaintiff's right to acquire the stock of a third party" (Plaintiff's Memorandum at 11, 12–13). In any event, the plaintiff in Commerce Reporting and plaintiff here were in wholly different positions with respect to the third-party corporations. There, the plaintiff had bargained to receive the shares of the third party; here, because of the nature of the arrangement, plaintiff was not even aware of the third-party's identity during the pendency of the contract.

ancy. One could search only in vain for broader implications. Defendant's alleged intention under Count I to compensate plaintiff only in the limited circumstance of its serving as the finder of the acquiring corporation actually accorded with ordinary commercial understanding; and, so, if deception or breach there was, it was hardly of concern to anyone but plaintiff. Similarly, under Count II, defendant's failure to disclose its own competitive role in the search for a buyer-corporation, or its consummation of the acquisition with Western Union, even if fraudulent, were matters of consequence solely to plaintiff.

We are, of course, mindful of the fact that for a fraudulent scheme to be cognizable under § 10(b), it need not relate to the "investment value" of the securities, or involve "the type of fraud that is 'usually associated with the sale or purchase of securities'." *A. T. Brod v. Perlow, supra,* 375 F.2d at 396–97. It was stated in *A. T. Brod* that "§ 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." 375 F.2d at 397. The premise of the decision in *A. T. Brod,* however, is the existence of injury to an interest within the protective net of the statute—*i. e.,* the interest of either an investor or the public; under that circumstance, the case contemplates redress to a private litigant without regard to the novelty of the form of the fraudulent device. Since no injury occurred in the present case with respect to a protected interest under § 10(b), plaintiff must be denied standing.

Accordingly, Counts I and II of the complaint are dismissed for failure to state a claim upon which relief can be granted and for lack of jurisdiction over the subject matter. In view of the disposition of the securities law claims, the pendent claims in Counts III to V are dismissed as well. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

SO ORDERED.