SNYCO, INC.

v.

**PENN CENTRAL CORPORATION, a Pennsylvania corporation, Buckeye Petrofuels Company, a Pennsylvania corporation, Buckeye Pipeline Company, an Ohio corporation, and D.J. Witman Co., a Pennsylvania corporation.**

Civ. A. No. 82–2262.

United States District Court, E.D. Pennsylvania.

Nov. 24, 1982.

---

James Curtis Wood, John B. Lampi, Harrisburg, Pa., for plaintiff.

Ralph W. Brenner, Francis P. Newell, John E. Caruso, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for defendants.

Carl Helmetag, Jr., Philadelphia, Pa., for Penn. Central Corp.

## MEMORANDUM AND ORDER

TROUTMAN, District Judge.

In August 1980, plaintiff, Snyco, Inc., conveyed its liquid petroleum distributorship to defendant, D.J. Witman Co. (Witman) which received plaintiff's assets, accounts receivable, inventory, equipment, motor vehicles and customer lists. Under the agreement, plaintiff left the liquid petroleum market and agreed not to compete therein for a term of five years. The agreement further provided a specific formula which contemplated that the full "pay out" would not occur for twelve months. Problems between the parties subsequently developed and plaintiff instituted this action charging that Witman, along with its related corporate co-defendants, Penn Central Corporation, Buckeye Petrofuels Co. and Buckeye Pipeline Company, violated federal antitrust and security laws. Plaintiff also alleges that the agreement of sale was consummated through the use of fraud and with the intention of pursuing a conspiracy to gain monopoly power in the liquid petroleum business.

We turn now to plaintiff's antitrust allegations and defendants' motion to dismiss.

The complaint alleges that in furtherance of their illicit attempt to monopolize the retail petroleum market, defendants embarked upon an unlawful plan to eliminate potential competitors by acquiring them for prices below their fair market value. As directed at plaintiff, the plan was executed in the following manner: defendants' acquisition of plaintiff included payment for customer lists, the ultimate price thereof to be determined by a formula whereby defendants generally agreed to pay plaintiff twelve cents per gallon for the gas which it, defendant, Witman, sold to those customers included on plaintiff's list. The agreement further provided that the twelve cents per gallon formula was only applicable to gas sales for the year immediately following the acquisition. Upon closing the transaction, Witman paid $96,000.00 as an advance payment to cover its projected sales to plaintiff's former customers. Business thereafter appeared to turn sour. According to plaintiff, defendants, acting through defendant Witman, purposefully failed to achieve the market position which they were capable of attaining; they, therefore, sold less than the projected gallonage to plaintiff's former customers and sought a $36,000.00 refund from plaintiff for the unearned portion of the $96,000.00 advance payment.

Hence, a reading of the complaint evidences plaintiff's general theory that defendants subverted the sales agreement by intentionally losing customers and retail sales in the year following its acquisition. As a result thereof, defendants purportedly succeeded in acquiring plaintiff for a price below the fair market value. This assertedly represents an element and evidence of defendants' corrupt scheme.

Defendants, moving to dismiss, argue that plaintiff lacks standing under Section 4 of the Clayton Act, 15 U.S.C. § 15, to assert an antitrust injury. Specifically, defendants argue that Section 4 of the Clayton Act (§ 4), which permits suit by "[a]ny

person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws", is an insufficient predicate upon which to assert standing since plaintiff has not suffered any *antitrust* injury. Rather, defendants asseverate that plaintiff's wrongful injury, if any, amounts to nothing more than a claim for fraud and/or breach of contract. Plaintiff, countering, argues that application of the Third Circuit's "factual matrix" test, as developed in *Cromar Co. v. Nuclear Materials and Equipment Corp.,* 543 F.2d 501, 506 (3d Cir.1976) and explicated upon in *Bravman v. Bassett Furniture Industries, Inc.,* 552 F.2d 90, 99 (3d Cir.1977), coupled with the analysis mandated by *Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), requires that defendants' motion be denied. We now turn to an analysis of the parties' contentions.

Defendants initially argue that their alleged violation of the antitrust laws was not the proximate cause of plaintiff's harm and that plaintiff, which voluntarily withdrew from the market and covenanted not to compete therein for a term of five years, has suffered no injury by virtue of any antitrust violations which may have occurred in a market in which it had no interest. Defendants place primary reliance upon *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981) and *A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753 (1st Cir. 1980). Finally, defendants concede that *Blue Shield* is relevant to our inquiry.

*Brunswick* considered the breadth of § 4 of the Clayton Act and concluded that in order to recover treble damages plaintiff must prove

> *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of

anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations . . . would be likely to cause'. *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. [100] at 125, 23 L.Ed.[2d] 129, 89 S.Ct. 1562 [at 1577] (emphasis in original; footnote omitted.)

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 489, 97 S.Ct. at 697. *Blue Shield* considered the quoted language from *Brunswick* and determined that plaintiff, whose treatment by a clinical psychologist was not covered by her group health plan while similar treatment by a psychiatrist was covered, had standing under § 4. The court observed that the alleged anti-competitive scheme by which Blue Shield purposefully benefitted the psychiatric community at the expense of psychologists "inevitably—though indirectly" suppressed competition in the psychotherapy market and that the resulting injury was borne by customers of such services. Indeed, plaintiff's injury was "inextricably intertwined" with that which the conspirators purportedly inflicted upon the psychotherapy market. *Blue Shield of Virginia v. McCready,* —— U.S. at ——, 102 S.Ct. at 2549.

Prior to reaching this conclusion, the court considered with "particularity" the relationship between the alleged injury and "those forms of injury about which Congress was likely to have been concerned in making defendants' conduct unlawful and in providing a private remedy under § 4". *Blue Shield of Virginia v. McCready,* at ——, 102 S.Ct. at 2547. In undertaking this inquiry, the Court did not purport to retreat from *Brunswick's* requirement that plaintiff's alleged antitrust injury must "flow from that which makes defendants' acts unlawful". *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. at 489, 97 S.Ct. at 697. *See, Blue Shield of Virginia v. McCready,* —— U.S. at —— ——, 102 S.Ct. at 2549–51. As such, we are concerned with the application of familiar rules which require that plaintiff's injury result from defendants' anticompetitive conduct. Application of these rules convinces us that plaintiff lacks standing.

Plaintiff, in *Chrysler*, argued unsuccessfully that the sale of its nonautomotive airconditioning subsidiaries was subverted by defendant who used the contract as an anticompetitive instrument to eliminate Chrysler from the product market. The court found an insurmountable standing barrier erected by Chrysler's voluntary withdrawal from the market and its covenant not to compete. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d at 1235. The *Chrysler* court further assumed a breakdown in competitive market conditions and observed that any loss which plaintiff may have suffered was not attributable thereto. It concluded that plaintiff's losses due to defendants' improper subversion of the sales contract would have been identical to any loss which it would have suffered had defendants failed to make payments under the contract for reasons unrelated to alleged antitrust violations. *Chrysler Corp. v. Fedders Corp.*, 643 F.2d at 1235. As such, plaintiff failed to meet § 4's threshold requirements since

> if the defendants had fulfilled their obligations as agreed Chrysler would have no complaint, yet would still be divested of its assets and precluded from competing in the market. Therefore, to the extent that Chrysler alleges damages resulting from its elimination from competition with the defendants it lacks the essential connection between injury and the aims of the antitrust laws necessary to establish standing. (citations and quotations omitted.)

*Id.*

*A.D.M.* also considered the sale of assets in a manner which purportedly violated applicable antitrust laws. There, in a *per curiam* opinion, the First Circuit held that unfair business practices do not generally rise to the level of antitrust violations absent a "finding" that the injuries have an "unreasonable effect on *competition*, as well as on a particular competitor". *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d at 754, (emphasis in original). For present purposes, we are, of course, constrained to avoid making any "finding" and simply test the sufficiency of plaintiff's allegations against *A.D.M.'s* articulated requirement that in order to assert standing, both competition and the competitor must suffer antitrust injury. Here, any injury which plaintiff suffered was due to the alleged business torts and fraud on the part of defendants *and* not any purported anticompetitive effect of the acquisition.

> "If the sale of plaintiff's assets had an effect on competition, it would have occurred whether or not [plaintiff] was harmed. There is thus lacking the essential connection between injury and the aims of the antitrust laws necessary to give [plaintiff] standing."

*A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d at 754. *See also, Turner v. Johnson and Johnson*, 549 F.Supp. 807 (D.Mass. 1982).

The combined teaching of *Chrysler* and *A.D.M.* is that plaintiffs who assert antitrust implications growing out of the subversion of contracts for the sale of their businesses, lack antitrust standing where they have completely exited the market and can show neither an unreasonable effect upon a particular competitor nor upon competition. Where, as here, the diminished number of competitors results from plaintiff's voluntary, contractual *withdrawal from the market,* the fact that the contract is breached does not amount to antitrust injury since plaintiff's market withdrawal and the resulting decreased competition, would have resulted even without the breach of contract. Hence, had the contract not been breached, plaintiff would have suffered no injury and could not assert standing, this even though an injury to the market would have allegedly occurred. Accordingly, defendants' breach of contract is not the "cause" of plaintiff's alleged "antitrust" injury. *See, Chrysler Corp. v. Fedders Corp.*, 643 F.2d at 1235.

This conclusion is not altered by application of the Third Circuit's "factual matrix" test. *See, Cromar Co. and Bravman.* Under this evaluation, courts consider:

> The nature of the industry in which the alleged antitrust violation exists, the rela-

tionship of the plaintiff to the alleged violator and the alleged effect of the antitrust violation upon the plaintiff. Then, while recognizing that breaches of the antitrust laws have effects throughout society, a court must decide whether *this* plaintiff is one whose protection is the fundamental purpose of the antitrust laws." (quotation omitted) (emphasis added).

*Cromar·Co. v. Nuclear Materials and Equipment Corp.,* 543 F.2d at 506.

Plaintiff's complaint is practically devoid of any allegations regarding the nature of the industry involved, the first subject of inquiry under the "factual matrix" test. Accordingly, this factor weighs in favor of defendants as we cannot assume the critical facts of our inquiry and, based thereupon, find for plaintiff. Hence, we forthwith consider the second element: the relationship between plaintiff and the alleged antitrust violator. Defendant Witman purchased plaintiff's accounts receivable, inventory, supplies and equipment, motor vehicles and customer lists. Accordingly, there is a direct relationship between the parties to this suit. The third element of the "factual matrix" inquiry, the alleged effect of the antitrust violation, fails to support plaintiff's standing. *See supra.* Lastly, application of the rules distilled from *Blue Shield, Chrysler* and *A.D.M.* compels the conclusion· that plaintiff is not one whose protection is fundamental to the purposes of the antitrust laws. Accordingly, we conclude that plaintiff lacks standing to assert an antitrust violation.

The second issue presented by defendants' motion to dismiss is whether the purchase of plaintiff's assets by defendant Witman constituted a "security" purchase within the meaning of § 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), or § 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). In addressing this question we note that the term "security" as used in the two Acts yields "virtually identical" results, *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 847 n. 12, 95 S.Ct. 2051, 2058 n. 12, 44

L.Ed.2d 691 (1975), and that a broad statutory construction thereof is mandated. *Marine Bank v. Weaver,* 455 U.S. 551, 555, 102 S.Ct. 1220, 1222, 71 L.Ed.2d 409 (1982). *See also, SEC v. W.J. Howey,* 328 U.S. 293, 299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

█ The articulated "test" to determine whether a particular transaction is a "security" within the meaning of the federal securities law requires reference to the "character" of the "instrument in commerce", *Marine Bank v. Weaver,* 455 U.S. at 455, 102 S.Ct. at 1222, *quoting SEC v. United Benefit Life Insurance Co.,* 387 U.S. 202, 211, 87 S.Ct. 1557, 1562, 18 L.Ed.2d 673 (1967), and focuses upon the "economic realities underlying the transaction". *United Housing Foundation, Inc. v. Forman,* 421 U.S. at 849, 95 S.Ct. at 2059. Specifically, the *Forman* court identified the "touchstone" of the court's analysis as centering upon whether there is "[1] an investment in a common venture [2] premised upon a reasonable expectation of profits to be [3] derived from the entrepreneurial or managerial efforts of others". 421 U.S. at 852. *See also, Provident National Bank v. Frankford Trust Co.,* 468 F.Supp. 448, 452 (E.D.Pa.1979).

█ In order to meet the first element of the *Forman* inquiry, plaintiff must be prepared to demonstrate that it "invested" and "shar[ed] or pool[ed] ... funds" with defendant. *Hirk v. Agri-Research Council, Inc.,* 561 F.2d 96, 101 (7th Cir.1977). The contract at issue, however, belies any "investment" by plaintiff in defendant Witman's business. Neither does it evidence any pooling of funds. Indeed, the Agreement of Sale only provides that

Buyer shall pay to Seller for Seller's liquid petroleum customer list, the sum of twelve cents ($.12) per gallon for all gallons sold during a one-year period from the Date of Closing to those of Seller's existing customers at Closing who are retained as customers of Buyer during such one-year period, subject, however, to [some minor] adjustments[.]

Agreement of Sale, *First,* D.

Pointing to this paragraph, plaintiff argues that its fortunes would rise or fall

upon the market success which defendant had; as such, it asserts that a common venture is made out. Countering, defendant urges that the quoted section is simply a valuation clause whereby plaintiff's goodwill, as expressed by actual consummated market sales for a twelve-month period could be properly determined. We agree with defendant that, in the context of the entire agreement, this paragraph merely fixes the price of plaintiff's good will. *Somogyi v. Butler,* 518 F.Supp. 970, 978 (D.N.J.1981) (indexing rental payments to total car sales did not amount to an "investment" given the entire agreement).

Moreover, the agreement does not indicate any basis for plaintiff to have a reasonable expectation to share in defendant Witman's profits. In fact, plaintiff has no right at all to share or participate in defendants' profits. Plaintiff retained only the right to receive twelve cents per gallon for sales covering a twelve-month period. Importantly, this valuation formula yardstick is premised upon gallons sold rather than profits realized. The agreement, fairly read, contemplates that plaintiff will receive payment for each gallon sold, this irrespective of whether defendant Witman realizes any profit on any particular gallon or for the year as a whole. Accordingly, we conclude that plaintiff has not retained the right to participate in defendant's profits.

The third factor which we consider, whether plaintiff would receive money from the entrepreneurial or managerial skills of defendant, is a neutral factor, neither resisting nor compelling dismissal. On one hand, and in a narrow sense, the valuation formula provides plaintiff with revenue based upon Witman's managerial skills; i.e., their ability to service plaintiff's former accounts. On the other hand, because the agreement looks to sales to plaintiff's former accounts as a basis for arriving at the valuation formula, the revenue which plaintiff receives from defendant for the twelve-month period is, to a large extent, dependent upon the managerial skill which plaintiff employed in servicing its former customers. Hence, in an economically realistic sense, rather than solely reflecting defend-

ant's managerial skills, the valuation formula is dependent upon the skill which plaintiff demonstrated in servicing its former clients, and the goodwill created thereby, coupled with defendant's ability to provide similarly satisfactory service.

Finally, we note that the lack of a public offering, *Lino v. City Investing Co.,* 487 F.2d 689, 694–95 (3d Cir.1973), coupled with a negotiated arms' length sale of a business by knowledgeable persons, *Anchor-Darling Industries, Inc. v. Suozzo,* 510 F.Supp. 659, 666 (E.D.Pa.1981), which takes the form of a unique agreement, *Marine Bank v. Weaver,* 455 U.S. at 559, 102 S.Ct. at 1225, underscores our conclusion that the transaction at bar did not involve the sale of a "security".

Having decided that plaintiff may not proceed upon its federal claims, we also conclude, within our discretion, that the pendent state claims should also be dismissed. Although we recognize our authority to transfer this matter to the appropriate state court, *Weaver v. Marine Bank,* 683 F.2d 744 (3d Cir.1982) (on remand from Supreme Court), plaintiff has not requested that we do so.

An appropriate order will issue granting defendants' motion to dismiss.