**GBJ CORPORATION, Plaintiff,**

v.

**SEQUA CORPORATION, Sequa Capital Corporation, and BT Securities Corporation, New York, Defendants.**

No. 91 Civ. 8675 (CSH).

United States District Court, S.D. New York.

Oct. 22, 1992.

Butler, Fitzgerald & Potter, New York City (Thomas A. Butler, Joseph Ginsberg, of counsel), for plaintiff.

Schulte Roth & Zabel, New York City (David M. Brodsky, Chaye Zuckerman Shapot, David B. Deitch, Jennifer Trahan, of counsel), for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

In this commercial action where the parties' citizenship is not diverse, the Court's subject matter jurisdiction depends upon whether plaintiff owns an interest in what may be characterized as a "security" under the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10). Contending that plaintiff does not, defendants move to dismiss the amended complaint under Rule 12(b)(1), Fed.R.Civ.P., for lack of subject matter jurisdiction.

### Background

Plaintiff GBJ Corporation ("GBJ") is a Delaware corporation with its principal place of business in East Northport, New York. It provides consulting services in connection with leveraged leases of equipment.

Defendant Sequa Corporation ("Sequa") is a Delaware corporation with its principal place of business in New York City. Defendant Sequa Capital Corporation ("SCC"), formerly known as Forsun Leasing Corporation ("Forsun"), is a New York corporation with its principal place of business in New York City. SCC is a wholly-owned subsidiary of Sequa. During the pertinent times Forsun acquired a leveraged lease portfolio of equipment which it leased to third parties. More recently SCC (the successor to Forsun) has sold some of those leveraged leases and intends to sell more.

Defendant BT Securities Corporation New York ("BTSC") is a New York corporation with its principal place of business in New York. BTSC is assisting SCC in the offering of the latter's leveraged leases to the public for sale.

On July 15, 1985 Forsun and GBJ entered into a consulting agreement whereby GBJ agreed to act as a consultant to Forsun and to furnish services with respect to the arranging of financing for the acquisition of equipment, arranging for third party leases of that equipment, and related activities. The consulting agreement describes the business of Forsun as "acquiring capital equipment and leasing same to third parties on either financing leases or operating leases." Page 1, Recital 1.

GBJ's compensation for these services is covered by ¶ 2 of the agreement, which provides in pertinent part:

Forsun shall pay to Consultant for the services which it shall perform as provided for herein a fee equal to ½ of 1/% of the cost of any and all equipment which Forsun acquires and leases to third parties during the term of this Agreement plus an amount equal to 10% of the residual value of all such equipment; provided that the amount of the residual value payable to Consultant for each equipment purchase shall not exceed 10% of the original cost of such equipment. Residual value for this purpose shall mean all proceeds from the sale of equipment after payment for and deduction of the balance of all costs and debts related to the acquisition of the equipment and the sale thereof, and any other revenues which Forsun shall receive with respect to any such equipment after expiration of the primary term of the leases thereof and after payment in full of any debt incurred in the acquisition of any such equipment, less any direct costs associate [sic] with producing such other revenues. Payment of the ½ of 1% fee upon acquisition of equipment shall be made at the closing for the acquisition of the equipment. Payment for same may be made directly by Forsun, by the lending institution providing debt financing to ac-

quire the equipment, by the leasee [sic] of the equipment, or by any other party to the transaction; provided, however, Consultant shall only be entitled to receive one payment for each transaction. Payments with regard to residual values shall be made when received by Forsun.

Evidently the business prospered at first. In its amended complaint GBJ alleges at ¶ 10 that, as the result of GBJ's performance of its obligations under the consulting agreement, "SCC secured a leveraged lease portfolio of approximately one billion ($1,000,000,000) Dollars."

The amended complaint further alleges that GBJ's standard fee for its services in connection with leveraged leases was from 1.5% to 3% of the cost of the leased equipment, plus reimbursement of direct expenses, payable in its entirety "upfront" at the closing of the leveraged leases, with no participation with GBJ in the residual value of the leased equipment. In this transaction, however, GBJ agreed "not to receive a normal commission, but instead agreed to receive a fee upfront of at least 1% less than the standard fee in return for a 10% residual interest in the equipment of the leveraged leases in the portfolio," *Id.* at 13–14. GBJ likens that compensation arrangement to an investment by it of "an aggregate of at least $10 million on the closing of the various leveraged leased transactions through the acquisition of its 10% residual interest," and a receipt by SCC and Sequa of "an immediate cash benefit of at least $10 million in acquiring SCC's leveraged lease portfolio." *Id.* at ¶¶ 14–15.

It appears from the motion papers that as certain leases expired, a gifted SCC executive negotiated favorable sales of the leased equipment, and GBJ received significant and profitable payments based upon the agreed-upon 10% of the residual value. But GBJ is now aggrieved because, as alleged in the amended complaint, Sequa has announced it is discontinuing six of its business units, including SCC, and in furtherance of that decision SCC is preparing to sell the remaining leveraged leases and the equipment which is the subject of them.

BTSC, retained by SCC as its exclusive agent in connection with such sales, has offered eight leveraged leases and the equipment covered by them for sale through a private placement offering memorandum dated October 1991. Those eight leveraged leases cover equipment with a total cost of about $288 million. Three of the eight leveraged leases covered by the offering memorandum were sold in December 1991 "without disclosing plaintiff's interest therein," Amended Complaint at ¶ 24. Defendants are charged with planning to sell the remaining five "to one or more persons without disclosing plaintiff's equity interest therein." *Id.* GBJ further alleges that SCC intends to offer for sale numerous other leveraged leases subject to the terms of the consulting agreement "without disclosing plaintiff's interest in said leases." *Id.* at ¶ 25.

In these circumstances, GBJ asserts as a first cause of action a claim against SCC and BTSC that they violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. GBJ alleges six additional state and common law claims against various defendants on grounds of pendent jurisdiction.

In support of its § 10(b) claim, GBJ alleges that the eight leveraged leases offered for sale are "securities" as defined by the 1934 Act, and that SCC and BTSC are defrauding "the purchasers of the eight leveraged leases as well as plaintiff in connection therewith by omitting to disclose material facts," namely, that GBJ "has a 10% equity interest in the residual value of the equipment covered by the eight leveraged leases." In consequence of this, GBJ alleges, it is and will be "a forced seller of its 10% interest in the residual value of the equipment which is the subject of the eight leveraged leases and deprived of the benefit thereof." Amended Complaint at ¶¶ 27–31. GBJ seeks injunctive and monetary relief.

Defendants move to dismiss the complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. They contend that GBJ's first claim does not allege a viable

cause of action under the federal securities laws; and that, in the absence of any other basis for subject matter jurisdiction, the pendent claims should be dismissed as well.

### Discussion

In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court held that the antifraud provisions of the 1934 Act may only be asserted by purchasers or sellers of securities. That is unquestionably true today with respect to claims for money damages. There is some authority for the proposition that the owner of a security may obtain injunctive relief even if he cannot satisfy the purchaser/seller requirement, *see, e.g., Davis v. Davis*, 526 F.2d 1286, 1287 (5th Cir.1976) (plaintiff shareholder had standing to seek injunctive relief for violations of federal securities laws), although other courts have questioned whether the injunction exception survives *Blue Chip Stamps, see Cowin v. Bresler*, 741 F.2d 410, 423–25 (D.C.Cir. 1984).

In the case at bar, GBJ seeks equitable relief and money damages. On the latter claim it characterizes itself as a forced seller of a security, under *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.), *cert. denied*, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967), and its progeny.

It is apparent that whatever its theory of liability or claim for relief, GBJ must show that it has an ownership interest in a "security." On that aspect of the case, GBJ contends that its consulting agreement with Forsun (later SCC) constitutes an "investment contract" as that term is used in

Section 3(a)(10) of the 1934 Act, 15 U.S.C. § 78c(a)(10). That section of the statute, set forth in the margin,[1] undertakes to define the "security" that falls within the ambit of the 1934 Act.

The case for GBJ is that the consulting agreement "granting plaintiff its interest in the residual value [of the leased equipment] meets all five of the investment contract requirements" articulated by *Securities Exchange Commission v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), and *Marine Bank v. Weaver*, 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). Plaintiff's brief at 15.

■ Under the five-part test derived from those cases, an "investment contract" means a contract, transaction, transaction or scheme whereby a person (1) invests his money (2) in a common enterprise and (3) is led to expect profits (4) solely from the efforts of the promoter or third party and (5) risks loss. *See Department of Economic Development v. Arthur Andersen & Co. (U.S.A.)*, 683 F.Supp. 1463, 1472 (S.D.N.Y.1988).

■ In the case at bar, GBJ is aware of the "purchaser-seller" limitation upon private damage actions brought under section 10(b) of the 1934 Act. *See Blue Chip Stamps, supra; Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.1952), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). As noted, GBJ characterizes itself as a forced seller under the *Vine* line of cases. However, GBJ must satisfy the threshold requirement that it be regarded as an "investor," who in "the vast

---

**1.** Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), provides:

(a) When used in this Chapter, unless the context otherwise requires—

(10) The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege or any security, certificate of deposit, for a security, or group or index of securities (includ-

ing any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

majority of cases" arising under § 10(b) "have been owners of rights in identified securities," *Niederhoffer, Cross & Zeckhauser v. Telstat Systems,* 436 F.Supp. 180, 184 (S.D.N.Y.1977). While a person's "investment," in order to meet the definition of an investment contract, need not take the form of cash only, but may consist of goods and services, *International Brotherhood of Teamsters v. Daniel,* 439 U.S. 551, 560 n. 12, 99 S.Ct. 790, 797 n. 12, 58 L.Ed.2d 808 (1979), the purported investment must be viewed within the context of the "total and indivisible compensation package." *Id.* at 560, 99 S.Ct. at 797. *Daniel* held that the 1934 Act did not apply to Union employees' noncontributory, compulsory pension plan. Consideration of the entire agreement between the parties is necessary because, as the Supreme Court observed in *Weaver,* "[t]he broad statutory definition [of a 'security'] is preceded, however, by the statement that the terms mentioned are not to be considered securities if 'the context otherwise requires ...,'" to which the Court added:

> Moreover, we are satisfied that Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud. 455 U.S. at 556 [102 S.Ct. at 1223].

Consequently, as Judge Conner of this Court said in *Niederhoffer,* "the judicial eye must remain focused upon the congressional concerns behind § 10(b) in the determination of the issue of a plaintiff's standing to sue." 436 F.Supp. at 183. A determination that a particular transaction may fall within the literal language of the securities statutes only begins the analysis, it does not end it. In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), the Court said:

> The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors. Be-

cause securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto. Thus, in construing these Acts against the background of their purpose, we are guided by a traditional canon of statutory construction:

> "[A] thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Church of the Holy Trinity v. United States,* 143 U.S. 457, 459 [12 S.Ct. 511, 512, 36 L.Ed. 226] (1892).

Consistent with that analysis, the Supreme Court has "emphasized the importance of ascertaining the congressional purposes underlying the statute as a means of defining the scope of the implied private right of action under § 10(b)." *Niederhoffer* at 183. Thus in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977), the Court dealt generally with the circumstances justifying an implied cause of action under § 10(b) of the 1934 Act:

> Congress did not expressly provide a private cause of action for violations of § 10(b). Although we have recognized an implied cause of action under that section in some circumstances, *Superintendent of Insurance v. Bankers Life & Cas. Co., supra,* [404 U.S. 6] at 13 n. 9 [92 S.Ct. 165 at 169 n. 9, 30 L.Ed.2d 128 (1971)], we have also recognized that a private cause of action under the antifraud provisions of the Securities Exchange Act should not be implied where it is "unnecessary to ensure the fulfillment of Congress' purpose" in adopting the Act. *Piper v. Chris–Craft Industries, ante,* [430 U.S. 1] at 41 [97 S.Ct. 926 at 949, 51 L.Ed.2d 124 (1977)]. *Cf. J.I. Case Co. v. Borak,* 377 U.S. 426, 431–433 [84 S.Ct. 1555, 1559–60, 12 L.Ed.2d 423] (1964).

The court must ask in each case if Congress intended to bring within the ambit of the federal securities antifraud laws the particular transaction described and griev-

ance asserted in the plaintiff's complaint. Thus the Court said in *Green* at 477, 97 S.Ct. at 1303:

> No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this "term of art" if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.

■ Applying these general principles to the case at bar, I think it plain that GBJ lacks standing to invoke the federal statute or rule. The July 15, 1985 agreement between Forsun and GBJ is a form of employment contract; ¶ 1 provides: "Forsun agrees to hire Consultant [GBJ] as a consultant and Consultant agrees to act as a consultant to Forsun and to provide to Forsun" specified services. ¶ 2, quoted *supra*, provides that part of GBJ's compensation "shall be made at the closing for the acquisition" of leased equipment, and the balance of its compensation, representing "[p]ayments with regard to residual values," shall be made "when received by Forsun." This language is clear and unambiguous. Its terms do not support plaintiff's· allegations that it "invested" in the leases or the leased equipment, Amended Complaint, ¶ 15, or that plaintiff has an "interest in the residual value of the equipment," *id.* at ¶ 31. Those characterizations fly in the face of the provisions of ¶ 2, which recite only that Forsun shall pay as deferred compensation to GBJ "an amount equal to 10% of the residual value" of the leased equipment, those payments to be made only when payments from third parties "with regard to residual value" are actually "received by Forsun." If the parties intended the contract to establish a vehicle by which GBJ would invest in the leased equipment and receive a property interest in return, words were available to state· that purpose. The words chosen clearly do not.

GBJ contends that the defendants' course of conduct with respect to selling the leases, past and proposed, violates GBJ's rights to compensation under ¶ 2. But neither the transaction between the parties nor GBJ's claims implicate the federal securities laws. In *Niederhoffer*, a closely analogous case, Judge Conner said:

> The allegations of fraud in the present case ... in no way threatened the integrity of securities transactions or markets as such. They simply bespeak frustrations of a private contractual expectancy. *Id.* at 186–87.

That is equally true of the case at bar.[2]

The dispute between the parties appears to turn upon the question of whether Sequa may sell the leases prior to their termination free of any obligation to make a "residual value" payment to GBJ. Whatever the answer to that or related disputes may be, and I express no view on them, I conclude without difficulty that Congress did not intend to bring such issues, arising out of such a contract, within the scope of § 10(b).

Indeed, *Niederhoffer* applies *a fortiori*. Plaintiff, a finder in the field of corporate acquisitions, was engaged by defendant to obtain a buyer interested in acquiring the defendant corporation by a purchase of its stock or assets or by a merger or consolidation. Plaintiff alleged, and Judge Conner accepted for Rule 12(b)(1) purposes, that in the event of an acquisition, defendant agreed to transfer to plaintiff, as payment for its services, "a portion of the security"

---

2. It is of no moment to this analysis that GBJ's compensation was deferred in part, *see Snyco, Inc. v. Penn Central Corp.*, 551 F.Supp. 949 (E.D.Pa.1982), or that the precise amount of that deferred entitlement was dependent in part upon future events, *see Somogyi v. Butler*, 518 F.Supp. 970 (D.N.J.1981). Of course, the nature of a particular transaction for § 10(b) purposes is fact-oriented. The cases cited by GBJ are inapposite.

GBJ also relies upon certain schedules and pages from SCC's financial statement, and the deposition testimony of Donald Farrell, the SCC employee who negotiated the sale of the leases, in aid of its contention that it has a property interest in the residual value of the leased equipment. But the intent of the parties must be derived from their written contract, and for the reasons stated in text, I do not think the contract admits of that interpretation.

received from the buyer. 436 F.Supp. at 181. That provision for compensation enabled plaintiff, in aid of its federal securities claim, to invoke § 3(a)(13) of the 1934 Act, which provides that the terms "buy" and "purchase" each include "any contract to buy, purchase, or otherwise acquire." Plaintiff in *Niederhoffer* argued that his compensation agreement constituted a contract for the purchase of securities: an argument not available to plaintiff at bar. Notwithstanding that additional theory, Judge Conner concluded that the agreement between the parties did not implicate the federal securities laws.

The case at bar presents other questions of substance, including whether the complaint sufficiently alleges a device, scheme, or artifice to defraud, or the omission of a material fact, of which GBJ may complain, and whether GBJ may properly be regarded as a forced seller of securities under the *Vine* line of cases. Since I conclude that GBJ does not cross the threshold, in that the contractual provisions for its compensation do not give rise to an investment contract or other form of "security," I need not reach those questions.

For the foregoing reasons, the Clerk of the Court is directed to dismiss plaintiff's first cause of action for lack of subject matter jurisdiction. In view of that disposition of the only federal claim, the Clerk is also directed to dismiss the pendent claims alleged in the remaining causes of action without prejudice. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

It is SO ORDERED.